# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

Nos. 03-2345 & 03-2915

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

CLARENCE HANKTON and
GREGORY DAVIS,[1]

*Defendants-Appellants.*

———————

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 01 CR 1—**Charles R. Norgle, Sr.**, *Judge.*

———————

ARGUED MAY 11, 2005—DECIDED DECEMBER 29, 2005

———————

Before COFFEY, MANION and WILLIAMS, *Circuit Judges.*

COFFEY, *Circuit Judge.* In a superseding indictment
dated May 15, 2002, Clarence Hankton, Greg Davis and six
other co-conspirators were charged in the United States
District Court for the Central District of Illinois with
conspiracy to possess with intent to distribute cocaine and
cocaine base, in violation of 21 U.S.C. § 846 and 18 U.S.C.
§ 2. The indictment also alleged that the defendants
participated in various other drug-related crimes arising
out of their membership in, and affiliation with, the

———————

[1] In an order dated July 16, 2003, this court consolidated the
appeals in this case for the purposes of briefing and disposition.

"Mickey Cobras" ("MCs") street gang, which operated on the north-side of Chicago, Illinois during the 1980s and 1990s.[2]

On November 21, 2002, Hankton signed a plea agreement in which he admitted distributing approximately 156 grams of cocaine base to a confidential informant, in violation of 21 U.S.C. § 841(a)(1). The following day, Davis also agreed to plead guilty to possessing, with the intent to distribute, approximately 250 grams of cocaine, also in violation of 21 U.S.C. § 841(a)(1). Hankton was subsequently sentenced to a term of 300 months in prison, while Davis was sentenced to 210 months. On appeal, both men challenge the district court's application of the guidelines to their sentences and claim that they are entitled to be re-sentenced in accordance with the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005). We uphold the validity of both Hankton and Davis' sentence, but remand to the district court for further consideration as mandated by this court's decision in *United States v. Paladino*, 401 F.3d 471 (7th Cir. 2005).

## I. BACKGROUND

During the late 1980s and early 1990s, Clarence Hankton and Gregory Davis were prominent members of the MCs, a dangerous and violent street gang that operated primarily out of housing projects on the north-west side of Chicago. The gang's various criminal undertakings were coordinated

---

[2] Hankton and Davis were also charged with the knowing and intentional use of a communication facility (*i.e.*, a telephone) in the commission of a felony (distribution of a controlled substance), and four separate counts of knowing and intentional distribution of cocaine base, in violation of 21 U.S.C. § 843(b) and 18 U.S.C. § 2. In addition, Hankton was charged with four separate counts of distribution of cocaine base, in violation of 21 U.S.C. § 841(a)(1), and Davis was charged with possession with intent to distribute cocaine, also in violation of 21 U.S.C. § 841(a)(1).

through a hierarchical-type infrastructure and included, but were not limited to, the possession and distribution of powder cocaine and cocaine base (better known as crack).[3]

In October 1999, the Federal Bureau of Investigation ("FBI") began investigating the MCs, utilizing confidential informants,[4] FBI surveillance and pen registers to gain information on the organization.[5] Information gathered in the initial operational phase of the investigation allowed law enforcement officers to gain a preliminary understanding of the gang's structure. Specifically, investigators learned that both Hankton and Davis held leadership roles in the MCs. Indeed, the evidence obtained by investigators made clear that Hankton had, over a period of years, progressed through the hierarchy of the MCs and attained the position of "King of Kings," or leader of the MCs on the entire north side of Chicago. Meanwhile, Davis held the position of "Sultan Supreme," a lieutenant and leader of the

---

[3] Cocaine base, better known as "crack" cocaine, is produced by "cooking" or mixing powder cocaine (cocaine hydrochloride) with sodium bicarbonate and boiling the mixture until left with a rocklike formation of pure "crack" cocaine (cocaine minus the hydrochloride). *See United States v. Puckett*, 405 F.3d 589, 597 n.8 (7th Cir. 2005); *United States v. Edwards*, 397 F.3d 570, 574 (7th Cir. 2005).

[4] During the investigation, the FBI temporarily used a member of the MCs to serve as a cooperating witness. The informant agreed to wear an undercover recording device while interacting with Hankton.

[5] "A pen register is a mechanical device that records the numbers dialed on a telephone by monitoring the electrical impulses caused when the dial on the phone is released." *United States v. New York Tel. Co.*, 434 U.S. 159, 161 n.1 (1977). A pen register is "usually installed at a central telephone facility [and] records on a paper tape all numbers dialed from [the] line" to which it is attached. *United States v. Giordano*, 416 U.S. 505, 549 n.1 (1974).

MCs at a particular locale—in this instance the Lathrop Homes projects on the north-west side of the city.

Despite success in the early stages of the investigation, in the Spring of 2000 investigators came upon a situation where the amount of information they required in order to sustain the issuance of criminal charges against members of the gang could no longer be safely obtained through the investigative techniques they were currently employing *(i.e.,* without putting agents in danger).[6] That being the case, the FBI applied for and received a court order authorizing a wiretap of Hankton's cellular phone.[7] While monitoring the wiretap, FBI agents recorded a number of inculpatory conversations between Hankton and his associates during the months of June, July and August of 2000.[8] The recorded conversations implicated Hankton, Davis and various other individuals in the trafficking and distribution of drugs, as well as other types of gang-related criminal activities and violence. The wiretaps also provided the FBI with further insight into Hankton and Davis' respective leadership roles in the MCs as well as more specific information on the hierarchal structure of the organization. Armed with this information, the government obtained arrest warrants for 19 individuals connected with the MCs and, on January 2,

---

[6] For example, the government was unable to "obtain conclusive information about Hankton and Hankton's associates . . . without arousing suspicion." Additionally, "the use of undercover agents [was determined to] be impractical and dangerous due to the 'highly suspicious' nature of the alleged offenders."

[7] The wiretap was granted pursuant to Title III of the Omnibus Crime Control and Safe Street Act of 1968, 18 U.S.C. §§ 2518 (1)(b) & (c).

[8] The initial intercept ran from June 15 to July 14, 2000, when the warrant expired. An extension was applied for and granted on July 20, 2000, and allowed continued surveillance through August 18, 2000.

2001, Hankton and Davis were apprehended on allegations of conspiring to possess cocaine and crack with the intent to distribute, in violation of 21 U.S.C. §§ 841 and 846.

Following the arrests, on July 3, 2001, Hankton and Davis, along with six[9] other individuals, were indicted *inter alia* on drug conspiracy and drug possession charges.[10] As discussed *infra*, Hankton and Davis entered into separate plea agreements with the government and each of them admitted facts sufficient to establish criminal liability beyond a reasonable doubt. In addition, both defendants and the government agreed to "reserve their respective right[s] to argue their [respective] position[s]" during post-conviction proceedings concerning certain factual issues relating to the sentencing aspect of the proceedings.

### A.  Hankton's Sentencing Hearing

In accordance with Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure Hankton pled guilty to three counts

---

[9]  Among the co-defendants were Woodrow Green, Jammah Olden, Rasuah Brunner, Ngaya Brunner, Timeka Murdock and Mekeba Gates, many of whom were also members of the MCs and all of whom also entered into plea agreements with the government.

[10] In a nine count superseding indictment issued on May 15, 2002, the grand jury charged both Hankton and Davis with "participating in a conspiracy to possess with intent to distribute and to distribute in excess of 500 grams of . . . cocaine and in excess of 50 grams of [crack cocaine]" (Count I) and using communication devices in committing the conspiracy (Count VII) in violation of 21 U.S.C. §§ 841 and 846. Also, Hankton and Davis were each charged with additional counts; Hankton was charged with "knowingly and intentionally" distributing over 150 grams of crack cocaine in violation of 21 U.S.C. § 841(a)(1) (Counts II, III, IV, and V) and Davis was charged with "knowingly and intentionally possessing with intent to distribute . . . approximately 250 grams of cocaine in violation of 21 U.S.C. § 841 (a)(1)" (Count VI).

of distribution of crack cocaine, in violation of 21 U.S.C. § 841(a)(1). As part of the plea agreement, Hankton admitted that on three separate occasions in Cook County, Illinois, between February and April 2000, he distributed a total of approximately 156 grams of crack to an individual who, unbeknownst to him, was a confidential informant recruited by the FBI.

Hankton's plea agreement also set forth his disagreement as to the two enhancements proposed by the government under the sentencing guidelines: one concerning the drug quantity involved and another pertaining to Hankton's alleged leadership role in the offense. As to the quantity of drugs Hankton should be held responsible for, it was the government's position that, pursuant to U.S.S.G. § 2D1.1(a)(3), Hankton's base offense level was 34 due to the aggregate amount of drugs involved in the offenses he admitted to, *i.e.*, more than 150 grams of crack. Nonetheless, the government insisted that "based on [Hankton's] offense conduct and relevant conduct" he was *actually* responsible for distributing more than 500 grams of crack, which would result in an offense level of 36. In addition, the government contended that Hankton's offense level should be "increased by 4 levels because the defendant was an organizer and leader of criminal activity that involved five or more participants," pursuant to U.S.S.G. § 3B1.1(a).[11]

To support the proposed guidelines enhancements, the government presented evidence detailing Hankton's role as a "leader or organizer" within the MCs organization. Bearing upon this was testimony given by a number of prosecution witnesses who confirmed Hankton's involvement in the murder of Annette Williams, a fellow member

---

[11] Subtracting 3 points for Hankton's acceptance of responsibility, *see* U.S.S.G. § 3E1.1, the government recommended that Hankton's requisite offense level should be 37 and that, due to the fact his criminal history category was at level III, the appropriate sentencing range was 262 to 327 months.

of the MCs, in April of 2004. Chicago Police Detective Kenneth Charles, one of the officers charged with investigating Williams' murder and a court recognized expert on the MCs, related information that he uncovered which led him to believe that Hankton had ordered the beating that resulted in Williams' death. Based on his understanding of the inner-workings of the MCs, Charles stated that on April 12, 2004, Williams had been issued a severe beating or "violation" as the MCs called it, for allegedly stealing approximately $3,000 from the gang. As Charles explained, Hankton held the position of "don" or foreman of the MCs at the Cabrini-Green housing project where Williams lived, and had the authority to order a "violation" of this kind. What's more, Detective Charles testified that he personally witnessed Hankton standing with several other men in the parking lot of Williams' building at 1150-60 North Sedgwick Street, from 8:00-10:00 p.m. the evening of her murder.

To corroborate Detective Charles' testimony, the government introduced sworn statements from two *sub rosa* government witnesses, identified in the record only as A and B.[12] In their statements both witnesses identify Hankton as the "don" or leader of the MCs at Cabrini-Green. A and B's statements also unequivocally acknowledge that the order to beat or issue a "violation" to Williams—which resulted in her death—was issued by Hankton personally.[13] They also related that the "viola

---

[12] The district judge mandated that the names of the witnesses be kept confidential, due to the fact that they feared retribution from the gang for their statements. In addition, the judge agreed to maintain the two witnesses statements under seal on the similar grounds.

[13] The statements did suggest that the original order to issue Williams a beating may have emanated from, or been approved by, a higher authority in the gang; however, A and B agree that

(continued...)

tion" or beating was ordered because Williams had stolen some money from the gang.

The government next introduced evidence directed towards establishing that Hankton was responsible for distributing more than 500 grams of crack cocaine, as opposed to the 150 grams he admitted to distributing. Agent Darin, a member of the FBI's joint gang task force and a trained drug traffic investigation agent, testified concerning Hankton's coordination of the drug trade for the MCs as well as his role as "King" or leader of the gang throughout the city in 2000 and 2001. In order to assist the court in understanding Hankton's role in the drug trade, Agent Darin—based on his training and four years of experience with drug investigations—testified as to his interpretations of the conversations extracted from the FBI's wiretap recordings, which were replete with code language.[14]

---

[13] (...continued)
the order to beat Williams came to them *directly* from Hankton.

[14] The members of the gang used phrases such as "a 16th" or a "teenager" to refer to 1/16th of an ounce of crack cocaine, "eight-ball", "ball" or "Michael Jordan" to refer to 1/8 of an ounce of crack cocaine, "quarter", "quaker" or "quake" to refer to 1/4 of an ounce of crack cocaine and "onion", "zone" or "piece" to refer to a whole ounce of crack cocaine. As this court has previously noted "[i]t is well known that drug dealers commonly use code language out of fear that their conversations will be intercepted." *United States v. Harris*, 271 F.3d 690, 702 (7th Cir. 2001). Indeed, as we noted in *United States v. Vega*:

> Conversations regarding drug transactions are rarely clear. A fact-finder must always draw inferences from veiled allusions and code words. In this case the jury was confronted with conversations which contained "code words" that, when considered in isolation, might seem unclear, veiled and almost nonsensical, but when analyzed properly, in the context of the totality of the evidence, can clearly be seen to
> (continued...)

Specifically, Darin provided background for a number of controlled drug purchases (from Hankton) conducted by the FBI[15] and described admissions by the co-defendants that they purchased varying amounts of crack cocaine from Hankton. In one conversation with a MCs associate, for example, Hankton is asked whether he "got that butter?". Hankton responds that "[i]t's . . . guaranteed." Agent Darin testified that "butter" was a common code word for cocaine and that the two were actually discussing the future sale of either crack or powder cocaine. In another conversation,

---

[14] (...continued)

> be "code words" for drugs. . . . It is true that, advisedly, no explicit mention was ever made of cocaine or other drugs in any of Vega's conversations with the Zambranas. However, a case was made, which was more than strong enough to convince the jury, that Vega used terms like "chickens," "roosters" and "it" as code words for drugs. Not only are code words always used by drug conspirators when they realize, as they do in today's drug culture, that their telephone conversations are frequently intercepted, such term were obviously used by the conspirators in this case. . . . [W]e have frequently upheld conspiracy determinations made by judges and juries which have relied upon inferences that "code words" or obscure language were meant to refer to drugs.

*Harris*, 271 F.3d at 702-03 (quoting *United States v. Vega*, 860 F.2d 779, 798 (7th Cir. 1988), abrogated on other grounds by *United States v. Durrive*, 902 F.2d 1221 (7th Cir. 1990)). As explained *infra*, the rules of evidence do not apply at sentencing, thus the judge's decision to consider the code language testimony given by Agent Darin was squarely within his discretion. *See, e.g., United States v. Hardamon*, 188 F.3d 843, 849 (7th Cir. 1999). Also, as the factfinder at sentencing, the judge was free to draw whatever conclusions he might about the testimony given and evidence introduced in order to determine an appropriate sentence. *See, e.g., United States v. Sutton*, 406 F.3d 472, 474 (7th Cir. 2005).

[15] Through the use of the cooperating witness, the FBI was able to conduct a number of controlled purchases of crack cocaine.

Darin described a conversation between Hankton and co-defendant Jammah Olden, where Olden requests that Hankton supply him with: "About a half." Darin testified that, "a half", as used in that particular context, referred to one half-ounce of crack cocaine. The government estimated that, based on Agent Darin's testimony and the wiretap evidence *alone*, Hankton was responsible for distributing approximately 456 grams of crack cocaine.[16]

Agent Darin also testified concerning Hankton's ascension from the role of "don," the title he held in the mid-1990s, to "King," the title he held from 1999 to 2001. As the "King," Hankton was responsible for everything from the direction of the conversion of powder cocaine into crack to the organization of the gang's basketball games. Hankton's role as "King" was also supported through Agent Darin's description of physical evidence that was confiscated from Hankton's residence upon a search warrant—such as letters calling Hankton the "King", statues of cobras wearing crowns and jewelry of crowns—all referring to Hankton's leadership position in the gang as the "King of Kings."

In order to corroborate Agent Darin's testimony, the prosecution called one of Hankton's co-defendants, Jammah Olden. Also a member of the MCs, Olden recounted that the main source of revenue for the gang was the sale of illegal drugs. Olden stated that Hankton regularly supplied him with crack (not powder cocaine) which he was instructed to

---

[16] The record reflects that most of the large "wholesale" purchases involved powder, as opposed to crack, cocaine. Nonetheless, as Agent Darin's testimony and the phone conversations established, Hankton dealt primarily in crack and the large "wholesale" purchases were made with the intent of converting the powder cocaine into crack.

sell to others.[17] Specifically, Olden testified that beginning in June of 2000 (until approximately October of 2000) Hankton had personally supplied him with amounts of crack cocaine ranging from one-eighth ounce to one-half ounce every three or four days. As Olden explained, Hankton would supply him with crack—essentially on credit—and then collect the proceeds from the sale of the crack from him at a later time. Olden's understanding was that, during that period of time, Hankton was the "King" or leader of the MCs on the North-Side of Chicago.[18] Specifically highlighting Hankton's leadership role, Olden went on to describe an instance where Hankton had ordered Olden and other members of the MCs not to "run", but to stand and fight when they became involved in an altercation with members of a rival gang, the Gangster Disciples, over drug peddling territory.

Finally, over objection from defense counsel, the government introduced the plea agreements of seven of Hankton's co-defendants.[19] In the plea agreements, which were signed and approved by each of the co-defendants and received into evidence at sentencing, the co-defendants describe receiving primarily crack cocaine from Hankton. When the amounts of crack cocaine that the co-defendants admitted Hankton

---

[17] Although there was some ambiguity in Olden's testimony as to his interpretation of the terminology used by the MCs to refer to crack cocaine, he eventually testified that he purchased a "hard form of cocaine" from Hankton.

[18] Olden also explained that in 1997, Hankton held the position of "Don of Dons" of the Cabrini Green projects on the north side of the city of Chicago, a position granting Hankton authority over other gang members. Olden testified that eventually Hankton became King of the north side of the city.

[19] Introduced were the plea agreements of Davis, Woodrow Green, Jammah Olden, Rasuah Brunner, Ngaya Brunner, Timeka Murdock and Mekeba Gates.

distributed to them were tallied, the government estimated that the amount of crack Hankton distributed (as established in the plea agreement documents alone) to be 1166 grams. The government concluded that, because Hankton had admitted to distributing 156 grams of cocaine and because the plea agreements attributed at least an additional 344 grams of crack to him, it was reasonable to conclude from the evidence presented at sentencing that he had distributed in excess of 500 grams of cocaine for the purposes of U.S.S.G § 2D1.1.

At the conclusion of the hearing, the trial judge concluded that based on the plea agreements and testimony given at sentencing, Hankton "could have reasonably foreseen that the amount of [crack cocaine] he was dealing . . . was well in excess of 500 grams, and could reach even beyond 1.5 kilograms." Indeed, the District Judge determined that the recorded "[Title III] calls alone take the amount well beyond the 500-gram minimum."[20] Moreover, citing the live testimony and the physical evidence confiscated from Hankton's residence (such as correspondence identifying Hankton as "King"), the court found that "[Hankton] [was] one of several organizers and one of several leaders within [the] structured criminal organization" and that he exercised "control" and "power" over other members of the gang and felt a four level leadership enhancement to Hankton's sentence was warranted pursuant to U.S.S.G. § 3B1.1(a) of the Guidelines.[21] The district judge, after hearing and

---

[20] Meaning that, without anything more, evidence of drug transactions referenced in the telephone recordings that Agent Darin testified concerning was sufficient to attribute over 500 grams of crack cocaine to Hankton under the sentencing guidelines.

[21] The court also considered the testimony of Detective Charles and the statements made by Witnesses A and B in determining

(continued...)

weighing the totality of the evidence, sentenced Hankton to 300 months imprisonment, which fell in the middle of the applicable guidelines range of 262 to 327 months.

### B.  Davis' Sentencing Hearing

Davis pled guilty to possession with intent to distribute cocaine and admitted that on June 27, 2000, he obtained approximately 250 grams of powder cocaine from Hankton, with the intention of distributing it to others.[22] Nonetheless, the government argued at sentencing that Davis was responsible for the possession of more than just the 250 grams of powder cocaine that he admitted to in the plea agreement. Instead, the government argued that, in addition to possessing powder cocaine, Davis was also responsible for possessing with the intent to distribute between 50 and 150 grams of crack cocaine, pursuant to U.S.S.G. § 2D1.1(a)(4).[23] In addition, the government maintained that Davis' offense level should also be increased by 3 levels because he qualified under the Guidelines as a "manager or supervisor" of a criminal activity involving more than five participants. *See* U.S.S.G. § 3B1.1(b). Davis disagreed with each of the proposed

---

[21] (...continued)

that Hankton was indeed a leader of the criminal enterprise. Specifically, the court found that Hankton's leadership role in the MCs was evinced by the fact that Hankton had the authority to "order the beating of Annette Williams, knowing that the beating could lead to her death."

[22] As part of the plea agreement, the government agreed to recommend that Davis be granted a 3 level reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1.

[23] Which would make his base offense level 32. *See* U.S.S.G. § 2D1.1(a)(4).

enhancements, in the plea agreement, reserved his right to argue his position at sentencing.

At Davis' sentencing hearing, the government began by calling Agent Darin to the stand as the first witness in support of the contention that Davis' sentence should be enhanced for the possession with the intent to distribute 50 to 150 grams of crack cocaine. Darin testified as to a series of taped wiretap colloquies between Hankton and Davis about the proper way to "cook" or convert powder cocaine to crack cocaine.[24] For example, during one of the taped consultations Davis acknowledges that he successfully cooked at least one ounce of cocaine that day and was "fittin' [sic] to do more." In the same conversation Davis states that earlier in the day he had procured an additional "dry nine" or nine ounces of powder cocaine in hopes of perfecting his crack producing skills. Days later in another conversation, Hankton asks Davis—who was apparently having problems cooking up some crack— whether he was cooking it on a stove or not, and Davis responds: "No. In the microwave, like I always do." Still a third drug conversation portrays Davis mentioning the purchase of approximately four and a half ounces of cocaine. Furthermore, Agent Darin also testified as to Davis' role as a manager/supervisor in the MCs drug operations. In particular, Darin testified concerning the contents of an intercepted phone conversation of July 24, 2000 between Davis and the previously mentioned co-defendant, Jammah Olden, where the two argue over what Davis refers to as his "workers." Evidently Davis became aware of the fact that Olden was selling drugs in an area where his "workers" were and became upset with him, telling the unidentified person (most likely Olden) on the phone that "y'all better not be [sic] get caught selling . . . . [t]hey's [sic] my workers." Two days later a telephone call from Davis to Hankton (Jammah Olden is on

---

[24] *See supra* p. 3 n.3 and accompanying text.

the tape and can be overheard in the background) illustrates Davis' anger over Olden invading his workers' drug spot or "lick" and warns that if his people weren't allowed to continue selling drugs in that area he would "fry that motherf[***]r up."

Following Agent Darin's testimony, the government introduced Davis' plea agreement as well as the plea agreements of the other co-defendants. In a number of those plea agreements, the defendants admit purchasing crack cocaine from Davis. For example, in her plea agreement, Ngaya Brunner admits purchasing three "eight-balls" of crack cocaine from Davis, which translates into approximately 10 and one-half grams.[25] The prosecution concluded that, when the plea-agreements were considered in relation to Agent Darin's testimony that Davis was a seasoned "cook" of cocaine, the reasonable inference was that Davis was responsible for possessing with the intent to distribute 50 to 150 grams of cocaine. In addition, it was the government's position that the plea agreements received in evidence demonstrated Davis' authority position in the MCs, citing references to him as "Sultan Supreme" or lieutenant in the gang and leader of the MCs at the Lathrop Homes.

At the close of the sentencing hearing, after weighing the evidence presented, the district court determined by a preponderance of the evidence that Davis had indeed possessed with intent to distribute between 50 and 150 grams of crack cocaine and that he was a "manager or supervisor of a criminal activity," within the meaning of § 3B1.1. The trial judge concluded that Davis' base offense level was 32 along with five criminal history points, meaning that the appropriate sentencing range to be applied was

---

[25] According to metric-conversions.org, .375 ounces equates to approximately 10.63107 grams. http://www. metric-conversions. org/

210 to 262 months. The district court sentenced Davis at the low end of the sentencing range and ordered that he be imprisoned for 210 months.

## II. ANALYSIS

On appeal, both Hankton and Davis argue that their respective sentences should be vacated as unconstitutional under the Sixth Amendment citing the district judge's belief that application of the guidelines was mandatory as well as the judge's subsequent enhancement of their sentences on facts which were neither proven to a jury beyond a reasonable doubt nor admitted by the appellants. *United States v. Booker*, 125 S.Ct. 738 (2005) and *United States v. Paladino*, 401 F.3d 471 (7th Cir. 2005). Both men also contend that the district court erroneously enhanced their sentences based on insufficient and unreliable evidence. Specifically, Hankton and Davis claim that the district court erroneously calculated the quantity of drugs attributable to them and that evidence (e.g., wiretap evidence) concerning their respective leadership roles in the drug offenses was inadmissable and unreliable and should not have been considered by the sentencing judge. In addition, Hankton also claims that the district court erroneously "double counted" by relying on his leadership role in the offense to enhance his sentence under §§ 3B1.1 and 2D1.1.

### A.   *Validity of Davis and Hankton's Sentencing Enhancements*

We review the district court's determination of drug quantity and role in the offense, "in the same manner as before *Booker*, for clear error." *United States v. Sutton*, 406 F.3d 472, 474 (7th Cir. 2005) (citing *United States v. Parra*, 402 F.3d 452, 462 (7th Cir. 2005)). Reversal will

be warranted " 'only if, after reviewing the entire evidence, we are left with the definite and firm conviction that a mistake has been made.' " *United States v. Sheikh*, 367 F.3d 683, 687 (7th Cir. 2004) (quoting *United States v. Frazier*, 213 F.3d 409, 417 (7th Cir. 2000)). This is a highly deferential standard of review and we refuse to "second-guess the sentencing judge." *United States v. Cleggett*, 179 F.3d 1051, 1059 (7th Cir. 1999) (citing *United States v. Garcia*, 66 F.3d 851, 856 (7th Cir. 1995)).

As this court has stated numerous times "[t]he law is very clear that a sentencing judge 'may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come.' . . . A corollary to this general principle is the rule that a sentencing judge 'may consider relevant information without regard to the rules of evidence . . . provided that the information has [a] sufficient indicia of reliability to support its probable accuracy.' " *United States v. Lemmons*, 230 F.3d 263, 267 (7th Cir. 2000) (quoting U.S.S.G. § 6A1.3); *see also United States v. Hardamon*, 188 F.3d 843, 849 (7th Cir. 1999) (stating that during the sentencing phase of a criminal proceeding "the rules of evidence do not apply and the sentencing judge is free to consider a wide range of evidence including hearsay."). The rationale for this is clear:

> The sentencing stage of a trial is one of the most important parts of the criminal process. In order for a judge to be well advised of the facts surrounding the defendant's background, and particularly in view of the judge's obligation to the general public, as well as to the defendant, to be fair, reasonable, and just, it is imperative that he be allowed to draw upon a wealth of information concerning the defendant's background, from his date of birth up to and including the moment of sentencing. . . . In order to render justice to all the judge must be able to impress upon a defendant through the

expansive contents of an all encompassing sentencing report that we are a country of laws and not men.

*Hardamon*, 188 F.3d at 849-50 (quoting *United States v. Gerstein*, 104 F.3d 973, 978 (7th Cir. 1997)). Indeed, the federal criminal code makes clear that: "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661. Accordingly, it is well-settled law that "hearsay is not only an acceptable basis for a sentencing determination," *United States v. Smith*, 3 F.3d 1088, 1100 (7th Cir. 1993), it is often an "integral part of the sentencing process," *United States v. Badger*, 983 F.2d 1443, 1459 (7th Cir. 2004).

Nonetheless, "[a] defendant has the due process right to be sentenced on the basis of accurate information." *United States v. Salinas*, 62 F.3d 855, 859 (7th Cir. 1995) (citing *United States v. Mustread*, 42 F.3d 1097, 1101 (7th Cir. 1994)). Thus, "[s]o long as the information which the sentencing judge considers has sufficient indicia of reliability to support its probable accuracy, the information may properly be taken into account in passing sentence*." United States v. Robinson*, 164 F.3d 1068, 1070 (7th Cir. 1999) (quoting *United States v. Taylor*, 72 F.3d 533, 543 (7th Cir. 1995)). "Only if a defendant 'shows that the information before the court was inaccurate, and that the court relied on it' can the defendant successfully challenge his sentence." *United States v. Smith*, 3 F.3d 1088, 1099 (quoting *United States v. Johnson*, 997 F.2d 248, 254 (7th Cir. June 16, 1993). In determining reliability we consider the totality of the evidence before the sentencing judge, *United States v. Span*, 170 F.3d 798, 803 (7th Cir. 1999), but a sentencing determination may be premised on any basis supported by the record. *See United States v. Sutton*, 406 F.3d 472, 474 (7th Cir. 2005) (citing *United States v. Benitez*, 92 F.3d 528, 538 (7th Cir. 1996)).

### 1. Drug Quantity

Both Hankton and Davis challenge the district court's enhancement of their sentences based on drug quantity. Specifically, Hankton argues that: (a) statements made by government witnesses at sentencing constituted unreliable hearsay and should not have been considered; and Hankton and Davis argue that (b) the introduction of plea agreements signed by co-defendants in the case also qualified as unreliable hearsay evidence and likewise should not have been considered. We disagree.

### a. The District Court's Determination of Hankton's Drug Quantity

Hankton's initial argument is that statements made by Agent Darin concerning various wiretap phone conversations should not have been relied on by the sentencing judge in his determination that Hankton was responsible for the distribution of more than 500 grams of crack under the guidelines. We disagree and believe this argument is misplaced.

Hankton has failed to point to anything in the record which might render Agent Darin's testimony at sentencing unreliable, aside from his assertion that portions of his Darin's testimony constituted inadmissibly hearsay. However, as stated above, the rules of evidence do not apply during sentencing proceedings and "hearsay is not only an acceptable basis for a sentencing determination," *United States v. Smith*, 3 F.3d at 1100, it is often an "integral part of the sentencing process*." Badger*, 983 F.2d at 1459.

In addition, the district judge specifically found Agent Darin to be a "credible witness", a determination which bolstered the judge's decision that Darin's testimony

concerning the wiretap conversations was reliable. *See United States v. Torres-Ramirez*, 213 F.3d 978, 980-81 (7th Cir. 2000) Under circumstances such as these we are unwilling to find fault with the sentencing judge's decision to credit Darin's statement in determining the drug quantity attributable to Hankton. *Torres-Ramirez*, 213 F.3d at 980-81.

Also, the district court did not rely solely on witness testimony concluding that Hankton was responsible for distributing more than 500 grams of crack. The government also introduced the signed plea agreements of other members of the MCs in which they admitted that they had purchased crack cocaine from Hankton. Although the plea agreements of the co-defendants may have constituted hearsay, *see* FED. R. EVID. 801, that evidence was corroborated by other evidence submitted at sentencing, and thus could reasonably be considered reliable by the sentencing judge. *See United States v. Martinez*, 289 F.3d 1023, 1028-29 (7th Cir. 2002) (holding that reliability may be established by corroborating evidence). Indeed, the plea agreements were more than sufficiently corroborated at Hankton's sentencing hearing by the credible testimony of the live witnesses, *i.e.*, Agent Darin and Detective Charles. As the district court concluded, "given the entirety of the government's submission, [Agent Darin's testimony] is reliable evidence and should be given substantial weight by the court . . . [i]t is corroborated . . . [i]t all ties together. It is consistent with what the court has heard as the various defendants have entered their pleas of guilty." We agree with this assessment. *See id.*

What's more, the evidence submitted at sentencing was internally consistent with the totality of the evidence in the record and various aspects of that evidence corroborated other aspects. For example, the co-defendants' plea agreements state that Hankton sold them primarily crack

cocaine—according to the government's calculation, 1156 grams total. This evidence corroborates both the wiretap phone conversations as well as Agent Darin's testimony as to the substance of those phone calls in which Hankton solicited the purchase of large amounts of crack cocaine, *e.g.*, telling Olden that he could supply him with "a half," or a half an ounce of crack. *See Salinas*, 62 F.3d at 859 (stating that "[e]ach member of a conspiracy is accountable for the amount of drugs with which he was directly involved, and for amounts involved in transactions that were reasonably foreseeable."). As this court held in *United States v. Torres-Ramirez*, credible corroborating testimony is sufficient to provide hearsay evidence, such as the plea agreements and the statements therein, with an "indicia of reliability" and satisfies the defendant's entitlement to have his sentence determined based on reliable evidence. *Id.* at 980. Also, the reliability of the plea agreements—as well as Agent Darin's testimony for that matter—was bolstered by the fact that, at sentencing, Hankton took advantage of "a reasonable opportunity to rebut the hearsay evidence used against him." *United States v. Barnes*, 117 F.3d 328, 338 (7th Cir. 1997) (quoting *United States v. Francis*, 39 F.3d 803, 810 (7th Cir. 1994)).

Further, even if we were to assume, *arguendo*, that the testimony given by Agent Darin as well as the co-defendants' plea ageements was unreliable, the live testimony of Jammah Olden, without more, supported—or at the least lent great credence to—the conclusion that Hankton distributed in excess of 500 grams of crack cocaine. As recounted above, Olden testified that for a period of five months (between June and October of 2000) Hankton personally supplied him with individual distribution amounts of crack cocaine—ranging in quantity from one eighth of an ounce to one ounce—every three to four days. According to Olden's testimony, which was unrebutted at sentencing, it was reasonable for the district court to

conclude that Hankton personally distributed between 134 and 1071 grams of crack cocaine, to Olden alone, in the space of just these five months.[26] *See Salinas*, 62 F.3d at 859; *see also United States v. Durham*, 211 F.3d 437, 444 (7th Cir. 2000) (stating that "estimates of drug quantity are acceptable if they are based on evidence possessing a sufficient indicia of reliability and not nebulous eyeballing").

Thus, because the plea agreements submitted at sentencing were corroborated by the credible testimony given by Agent Darin, as well as the live testimony of co-defendant Olden—both of which were subject to thorough cross-examination at sentencing—we hold that the sentencing judge did not err, much less commit clear error when considering this most reliable evidence when determining that Hankton was responsible for distributing in excess of 500 grams of crack cocaine pursuant to U.S.S.G. § 2D1.1.

### b.   Davis' Drug Quantity Argument

Davis also argues that the sentencing court erred by admitting unreliable hearsay evidence when determining that he possessed with intent to distribute 50 to 150 grams of cocaine under U.S.S.G. § 2D1.1. However, unlike Hankton, Davis does not claim that Agent Darin's testimony was unreliable. Instead, Davis claims only that the introduction of the co-defendants' plea agreements constituted clear error due to the fact that the agreements were

---

[26] Even a conservative estimate of the amount of cocaine Hankton supplied Olden with amounts to approximately 4.6875 ounces or 134 grams of crack cocaine (which is equal to Hankton supplying Olden with 1/8 oz. of crack cocaine every four days over a period of five months). On the high end, Hankton may have supplied Olden with as much as 1071 grams of crack (which is equal to 1 oz. of crack every four or five days over a period of five months).

inadmissible hearsay. However, as noted above, the relevant inquiry is not whether the plea agreements submitted at sentencing constituted hearsay, *see Smith*, 3 F.3d at 1100, but whether the plea agreements included a "sufficient indicia of reliability to support [their] probable accuracy," *Taylor*, 72 F.3d at 543, which we conclude that they did.

The co-defendants' plea agreements submitted at Davis' sentencing demonstrated that Davis was in the habit of distributing crack cocaine. In particular, Ngaya Brunner admits to purchasing approximately 10 and one-half grams of crack from Davis. This evidence was fully corroborated by the testimony of Agent Darin, which the sentencing judge expressly found to be credible. Specifically, Agent Darin testified as to the meaning and context of a number of intercepted phone conversations Davis had with Hankton and other individuals in which Davis discussed "cooking" large amounts of powder cocaine in order to produce crack cocaine. In at least one of those conversations Davis states that he purchased powder cocaine specifically for the purpose of further processing it in order to manufacture and distribute the resulting crack. *See supra* p. 13. Thus, because witness testimony—the testimony of a witness, Agent Darin, whom the district judge had previously determined to be credible—was introduced to corroborate information contained in the co-defendant's plea agreements and thus infused that evidence with an "indicia of reliability." *See United States v. Martinez*, 289 F.3d at 1028-29; *Torres-Ramirez*, 213 F.3d at 980. This is not to mention the fact that Davis was provided with ample opportunity to rebut the hearsay evidence proffered against him in the form of the co-defendant plea agreements, either by calling his own exculpatory witnesses or through his cross examination of Agent Darin. *See Barnes*, 117 F.3d at 338. The fact that Davis called no witnesses at sentencing and failed to successfully discredit Agent Darin on cross-examination,

however, evinces nothing more than a shortcoming in the presentation of his case and falls far short of establishing error on the part of the trial judge. In other words, Davis must present this court with more than conclusory allegations that a government witness is unreliable; he must present evidence which would in some way rebut that testimony or demonstrate that it is inaccurate and should not have been relied upon by the sentencing judge. *See United States v. Smith*, 3 F.3d 1088, 1099.

Thus, because Agent Darin's credible testimony corroborated the information contained in the co-defendants' plea agreements, the sentencing court did not err in finding that evidence reliable in concluding that Davis was responsible for possessing with the intent to distribute 50 to 150 grams of crack cocaine.[27]

---

[27] Davis also challenges the enhancement of his sentence under § 3B1.1(b) for being a "manager or supervisor (but not an organizer or leader)" in the criminal activity on identical grounds. However, because we have held that the court's consideration of the co-defendant's plea agreements at sentencing did not constitute clear error under any circumstances, we need not separately discuss Davis' challenge to the enhancements to his sentence under § 3B1.1(b).

Nonetheless, even if we were to hold that the plea agreements were unreliable and should not have been considered, the enhancement was still supported by the record. *See Sutton*, 406 F.3d at 474. The record reflects that Davis, during intercepted phone conversations, repeatedly referred to people on the street selling drugs as his "workers." *See supra* p. 13. Davis also threatened violence when he learned that Olden's drug dealers had invaded his "territory." This evidence unquestionably evinces a level of control sufficient to satisfy the "manager or supervisor" enhancement pursuant to § 3B1.1(b). *See, e.g.*, *United States v. Morales*, 994 F.2d 386, 388 (7th Cir. 1993) (holding that "[i]t is enough that more than one person was involved in the criminal activity and

(continued...)

### B. *Hankton's Leadership Role in the Offense*

Hankton next claims that it was clear error for the district court to determine that he was an "organizer or leader of a criminal activity" pursuant to § 3B1.1(a) of the Guidelines. Specifically, he claims that "notwithstanding evidence that he held a high rank in the MCs, his role in that organization did not make him a leader or organizer in a drug distribution offense." Hankton stresses that his rank in the MCs alone did not translate into leadership responsibility, much less control over the gang's drug distribution activities. Said differently, Hankton takes issue with the sentencing judge's focus on his leadership conduct which he claims is "unrelated" to the underlying crime of distribution of a controlled substance. We disagree.

The district court's "determination concerning a defendant's role in the offense is a finding of fact, subject to a clearly erroneous standard of review on appeal," *United States v. Brown*, 900 F.2d 1098, 1101 (7th Cir. 1990), and this remains the case post-*Booker*. *See Parra*, 402 F.3d at 462. Section 3B1.1 of the sentencing guidelines is applicable where the "defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). This court has previously made clear that the "control" exerted by a defendant may either be direct or indirect in nature. *See United States v. Barnes*, 117 F.3d 328, 337 (7th Cir. 1997). As such, "the defendant must have exercised some degree of control over others involved in the commission of the offense or he must have been responsible for organizing others for the purpose of carrying out the crime." *Id.* (quoting *United States v. Carson*, 9 F.3d 576, 584 (7th Cir.

---

[27] (...continued)
that the defendant played a leadership as distinct from a followership role") (citing *United States v. Herrera*, 878 F.2d 997 (7th Cir. 1989)).

1993)); *see United States v. Reneslacis*, 349 F.3d 412, 417 (7th Cir. 2003). Some of the factors for a sentencing court to consider when determining whether a defendant held a leadership role under § 3B1.1 include: "the defendant's (1) exercise of decision-making authority; (2) participation in committing the offense; (3) recruitment of accomplices; (4) degree of participation in planning or organizing the criminal activity; (5) degree of control or authority exercised over others involved in the criminal activity; and (6) the nature and scope of the illegal activity." *United States v. Falcon*, 347 F.3d 1000, 1004 (7th Cir. 2003) (citing *United States v. Noble*, 246 F.3d 946, 953 (7th Cir. 2003)).

At Hankton's sentencing, the judge enumerated a number of factors which led him to the conclusion that Hankton was a "leader or organizer" of a criminal activity—here the distribution of crack cocaine—within the meaning of § 3B1.1(a). For example, although the judge recognized that Hankton was not the "sole and only leader of the organization," he did "exercise control . . . . [and] power . . . . [t]he telephone calls clearly establish that . . . . [t]hey show his concern for the organization itself, its image." In addition, the court referenced evidence presented by the government which illustrated Hankton's role in the murder of Annette Williams, *see supra* pp. 7-8, when stating that "Hankton exercised authority over persons, certainly well more than five or ten." However, Hankton claims that "rather than directing its remarks to Mr. Hankton's conduct as it related to the actual offence, i.e., drug distribution, the court dwelled on Mr. Hankton's gang activities." This statement is nothing more than a self-serving red herring.

While it may be true that the sentencing judge primarily focused on Hankton's gang activities, there was good reason for doing so. The evidence presented at sentencing did not separate Hankton's activities into two distinct categories of: (1) gang activities; and (2) drug activities. Indeed, it would be antithetical to consider these to be mutually exclusive

endeavors. Instead, all of the evidence presented—as well as commonsense—suggest that, in fact, Hankton's gang activities were intimately, related to and intertwined with, his drug distribution activities. In fact, both Agent Darin and Jammah Olden testified that the gang's sole source of revenues was from the sale of illegal drugs. Also, information from the wiretaps demonstrated that Hankton used his position in the gang to facilitate his drug transactions, collect money for himself and protect the gang's drug dealing territory. *See supra* p.7-9. What's more, Hankton's role as leader and organizer is rather persuasively illustrated by the fact that he had the power within the MCs organization to order the brutal beating and murder of one of the gang's members, Annette Williams. *See id*. The fact that Williams' murder appeared to involve a dispute over drug money, as opposed to drugs, would not preclude the sentencing judge from inferring that the incident was related to the MCs drug activities or from concluding that Hankton exerted the same authority over the gang's drug activities as he did over ordering beatings or murder. After all, a sentencing court in making its sentencing determination must "draw inferences from a variety of data, including the defendant's demeanor and information in the [presentence report], in order to reach [its] conclusion." *See United States v. Frazier*, 213 F.3d 709, 417 (7th Cir. 2000) (quoting *United States v. Fones*, 51 F.3d 663, 665 (7th Cir. 1995)).

Thus, because Hankton was a leader of the MCs, and because the gang was primarily concerned with dealing illegal drugs, it was entirely reasonable and logical for the sentencing judge to infer that Hankton's role as leader of the gang was related to his distribution of crack cocaine.[28]

---

[28] Although not dispositive as to his role as a leader in the organization, Hankton is referred to in the record first as "don"

(continued...)

### C.  Hankton's Double Counting Claim

Hankton also claims that the district court erroneously double counted when imposing his sentencing enhancements because the court considered his leadership within the MCs street gang both to enhance his sentence for finding him responsible for distributing more than 500 grams of cocaine, under § 2D1.1, and for being an organizer

---

[28] (...continued)

(during the late 1990s) and then as "king" (beginning in 1999). *See supra* pp. 8-9; *see also* U.S.S.G. § 3B1.1 n.1 ("In distinguishing a leadership role from one of mere management or supervision, titles such as "kingpin" or "boss" are not controlling.). Nonetheless, testimony from Chicago Police Detective Charles, as well as Agent Darin and Jammah Olden illustrated the power over the drug trade and gang activities that the title afforded Hankton. For example, Agent Darin testified that as the "king," Hankton was in charge of all the activities undertaken by the MCs on the northside of the city, including the distribution of illegal narcotics. *See supra* p. 9.

Hankton argues that the testimony of Detective Charles and Agent Darin as to his role in the MCs should not have been considered because they "were [not] qualified as experts in anything." This is misleading, for the district court made an express finding that Detective Charles was indeed an expert on the MCs, *see supra* p. 7, as well as expressly finding him to be a "credible witness." Likewise, Agent Darin was also expressly found by the judge to be a credible and reliable witness. *See supra* p. 19-20. Nevertheless, as we have stated, the rules of evidence do not apply at sentencing, *see Hardamon*, 188 F.3d at 849, and the judge was entitled to consider any relevant evidence assuming that evidence included a "sufficient indicia of reliability." *See Robinson*, 164 F.3d at 1070. The testimony given by Detective Charles and Agent Darin was more than reliable and therefore properly considered by the district court in sentencing Hankton.

or leader of a criminal activity, under § 3B1.1. We disagree.

Improper and impermissible double counting only "occurs when a district court imposes two or more upward adjustments within the guideline range, when both are premised on the *same* conduct." *U.S. v. Haines*, 32 F.3d 290, 293 (7th Cir. 1994) (emphasis in original). Put simply, a district court may not characterize the same conduct in two different ways to arrive at two separate sentence enhancements that result in an upward adjustment of the sentencing range. *See United States v. Schmeilski*, 408 F.3d 917, 919 (7th Cir. 2005). Also, "although premising multiple enhancements on 'identical facts' constitutes impermissible double counting . . . the presence of some overlap in the factual basis for two or more upward adjustments does not automatically qualify as double counting." *Id.* (internal citations omitted); (citing *United States v. Parolin*, 239 F.3d 922, 929 (7th Cir. 2000). Where different aspects or components of the defendant's behavior are addressed by different enhancements, improper double counting has not occurred. *See id.* We review the district court's application of the Sentencing Guidelines *de novo. See, e.g., United States v. Von Loh*, 417 F.3d 710, 712 (7th Cir. 2005).

Hankton's claim of impermissible double counting finds no support in the record, much less the voluminous amount of case law on this subject. The disparate nature of behavior addressed under each enhancement, without more, suggests that impermissible double counting pursuant to those particular enhancements would be most unlikely. *See United States v. Schmeilski*, 408 F.3d 917, 920 (7th Cir. 2005). In fact, §§ 2D1.1 and 3B1.1(a) are premised on *entirely* different conduct; for while an individual may be found to have distributed a certain quantity of drugs making him eligible for a sentence enhancement under § 2D1.1, he need not be a "leader or organizer" of a criminal activity, as described by § 3B1.1, to do so. Nonetheless, Hankton argues that the sentencing judge's mention of his

leadership role in the organization while finding that he
was also eligible for a sentence enhancement for distribut-
ing more than 500 grams of cocaine under § 2D1.1 consti-
tuted impermissible double counting. Nothing could be
further from the truth.

When determining the drug quantity attributable to
Hankton pursuant to § 2D1.1 the judge specifically found
that, considering the admissions of the defendant in the
plea agreement as well as the evidence concerning the
intercepted phone conversations, Hankton was responsible
for distributing "well beyond . . . 500 gram[s]" of crack. It is
true that later in the same monologue the judge mentions
"the position" Hankton occupied to illustrate the point that
the actual amount attributable to him "could reach even
beyond 1.5 kilograms." It is clear from those statements,
however, that without taking Hankton's leadership role in
the offense into consideration, the judge determined that
the sentencing enhancement should apply, making any
other drug amounts attributable to Hankton via his leader-
ship role superfluous.[29] Said differently, the judge concluded
that Hankton was personally responsible for distributing
"well beyond . . . 500 gram[s]" of crack cocaine, which
justified the enhancement of his sentence under § 2D1.1.
Accordingly, consideration of any additional amounts
attributable to him via his leadership role in the MCs was
superfluous.[30]

---

[29] However, even if the judge had taken into account Hankton's
leadership role when determining the quantity of drugs at-
tributing attributable to him, this would not have been improper
because, as explained above, although there may have been some
overlap in the factual predicate for both enhancements, each
enhancement "addressed distinct aspects of the defendant's
conduct." *Schmeilski*, 408 F.3d at 919.

[30] Although they very well could have been considered. *See*
(continued...)

Thus, since § 2D1.1 and § 3B1.1 address different conduct and because the trial judge did not rely on Hankton's leadership role in the MCs to enhance his sentence pursuant to § 2D1.1, there was no improper double counting and Hankton's claim fails in this regard.

### D.  *Paladino* Remand

Finally, Hankton and Davis request that we order a limited remand to determine whether the district court would have imposed a different sentence had it known that the Sentencing Guidelines were merely advisory. *See United States v. Paladino*, 401 F.3d 471, 481 (7th Cir. 2005). Because neither Hankton nor Davis raised a *Booker* issue before the district court our review is for plain error only. *See id*. As this court has held, the pre-*Booker* mandatory application of the sentencing guidelines *ipso facto* constitutes plain error. *See United States v. White*, 406 F.3d 827, 2005 WL 1023032, at *7 (7th Cir. May 3, 2005); *United States v. Castillo*, 406 F.3d 806, 2005 WL 1023029, at *15 (7th Cir. May 3, 2005). However, even where a plain error is found to exist, a court of appeals may "exercise its discretion to notice a forfeited error . . . only if . . . the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Cotton*, 535 U.S. 625, 631 (2002). In other words, we may correct such an error only if it is "intolerable," or results in a "miscarriage of justice." *See Paladino*, 401 F.3d at 481. Allowing an illegal sentence to stand would "constitute a miscarriage of justice," *see White*, 406 F.3d at 835-36.

On the record before us, we cannot ascertain with any exacting degree of certainty whether the sentencing judge would have imposed identical sentences for Hankton and

---

[30] (...continued)
*Salinas*, 62 F.3d at 859.

Davis had he known that the sentencing guidelines were not mandatory at the time. Indeed, the district court's imposition of a sentence in the middle of the range for Hankton, *see supra* p. 13, and at the lower-end of the range for Davis, *see supra* p. 16, may be an indication that, having been vested with greater discretion, the judge may well have imposed a sentence lighter than that required by the guidelines. We simply cannot be sure. Accordingly, lest we allow an illegal sentence to stand, we believe it appropriate to order a limited remand in this case, while retaining jurisdiction, for proceedings consistent with this court's decision in *Paladino*, 401 F.3d at 483-84.

### III. CONCLUSION

Because we are convinced that the district court did not impermissibly consider unreliable evidence in enhancing Hankton or Davis' sentences for drug quantity and their respective leadership roles in the offense we uphold the validity of the sentencing enhancements imposed. In addition, we reject Hankton's claim that the sentencing judge's application of U.S.S.G. §§ 2D1.1 and 3B1.1 to his sentence constituted improper double counting. We do however order a LIMITED REMAND of both Hankton and Davis' sentences in accordance with the procedure set forth in *United States v. Paladino*.

A true Copy:

       Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*
