In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 08-2094 & 08-2675

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MARCUS CORSON and OSCAR ALVAREZ,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
Nos. 06-CR-930-2 & 06-CR-930-3—**Rebecca R. Pallmeyer**, *Judge.*

ARGUED MAY 14, 2009—DECIDED AUGUST 27, 2009

Before RIPPLE, MANION, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* Marcus Corson and Oscar Alvarez were charged with two conspiracies, one to rob a drug stash house and the other to sell what they planned to steal. This seems straightforward enough. But there's a twist. There never was any stash house to rob. Nor were there any drugs. And the two people who introduced Corson and Alvarez to the stash house plan never intended to rob anything. That's because one was a gov-

ernment agent and the other a confidential informant ("CI"). This fictitious stash house plot was concocted by law enforcement to entice all-too-eager gangsters to agree to do something illegal.

In the end, there was no robbery, and nobody testified that they saw the defendants with firearms. But the jury convicted on both counts.

Corson and Alvarez appeal their convictions. If judges sat in a policy-making role, perhaps we might have reason to wonder whether this scheme was the right use of law enforcement resources. But directing policy is not within our province. Instead, in this case, our duty is to assess whether the evidence was sufficient for a jury to convict. It's an uphill battle to overturn a jury verdict. Assessing credibility of witnesses and interpreting the evidence are tasks ordinarily left to the jury. After reviewing the record we conclude that there was sufficient evidence for the jury to find guilt beyond a reasonable doubt. We affirm their convictions, and we also affirm Corson's sentence.

## I. Background

The Bureau of Alcohol, Tobacco and Firearms ("ATF") hatched their stash house sting operation in early November 2006. ATF agents met with the CI and asked whether he knew anyone who might be interested in robbing a drug stash house. The CI identified Marcus Corson and his brother Aaron. (Aaron Corson was also tried and convicted but he withdrew his appeal. To avoid confusion,

we will hereafter refer to the Corson brothers by their first names only.) So the ATF instructed the CI to make contact. The CI called Marcus and told him about a "business opportunity." Marcus showed some interest and on November 8 told the CI to meet him at the home of the third defendant, Oscar Alvarez, that day.

The CI showed up to Alvarez's place wearing a body wire, a digital recording device that would capture their conversations. The jury would hear and read a transcription of all of what was said. The CI started to tell Marcus and Alvarez about the plan, describing how he worked security for a guy he met in prison named Loquito, or "Loqs," who worked for a Mexican drug organization. (Of course, there was no Mexican drug organization and "Loquito" was actually an undercover ATF agent.) Before the CI mentioned the robbery, though, Marcus and Alvarez jumped in and asked whether the CI was talking about a "gank" (meaning a heist). When the CI responded affirmatively, Alvarez asked, "How much you talkin'?" to which the CI responded "bricks" of cocaine (the coke, not money, was the target of the robbery). Marcus got excited and Alvarez asked the CI whether he was talking about "runnin and robbin' some niggas" and to "make it clear, the details."

The CI explained the operation: Loquito would not know the location of the stash house until just one hour before the drugs arrived; but once he knew the location, he would call the CI. Then the Corson-Alvarez crew could execute the robbery. Marcus and Alvarez probed the CI for details. Marcus asked if the stash

house guards would be "strapped, too," meaning carrying firearms. The CI said they probably would be. But that didn't matter. Marcus and Alvarez said they were in. Marcus: "I'm down, bro. That ain't no thing. I'm down. Ain't a question." Alvarez: "We in it. We in it a hundred percent, bro." As for the guards, Marcus said he wouldn't hesitate to kill them. Marcus then told the CI that his brother Aaron would be involved too and that the three of them had done robberies in the past. They agreed to meet the next day.

During all this Marcus and Alvarez repeatedly expressed their concern—not over whether the plan was real, but whether the drugs would certainly be at the stash house: "if you send us in, the shit gotta be there, bro. He gotta know if it's there." Marcus repeated this ultimatum: "But the only thing is . . . you gotta make sure this shit's there." And so did Alvarez: "But, ya know what I'm sayin', if shit don't go right, nigga, that falls on you and him." The CI assured them the drugs would be there.

Marcus left but Alvarez stayed to meet Loquito (the undercover agent), who was waiting in a car nearby. Loquito explained how the Mexican drug operation and the stash houses worked and said they were looking at 20 to 25 kilos of coke being in the stash house. Loquito asked whether Alvarez and the Corsons were up to the task, and Alvarez repeatedly recommitted: "You got the crew. We got the crew"; "Everything sounds good . . . . it's gravy"; "Yeah. I'm in." Alvarez explained that he and the Corsons had done these kinds of robberies

before and had no problem killing the guards in the stash house. If the guards had guns, no problem; they had their own. And Alvarez even debated how he'd like to execute the robbery: at first "with the intentions of quietness," but later saying it might be better to do it "like a police raid." But again, through all this, Alvarez reiterated the earlier concern about the drugs being at the stash house. The drugs had to be there. Loquito assured him they would be. So they agreed to meet the next day.

They didn't meet for a couple of weeks though. On November 20, Alvarez and both Corsons met with the CI and Loquito. These conversations were also recorded. Before they met, the CI told Alvarez and Marcus that Loquito was scared to enter their house. Alvarez responded: "Well, fuck that, man. If he on some scary shit, ain't no sense doin' it. Tell, tell him to come on." Marcus, too, expressed some frustration. Eventually, though, the defendants relented and met with Loquito outside in a van. Loquito explained the robbery job to everyone. He told them that the drug cartel used empty houses to stash drugs and that he would only know the location of one of those houses just hours before the drugs arrived. There were usually 15 to 20 kilos of cocaine. Loquito also said that the guards of the stash house would be armed. The defendants asked about what kinds of weapons the guards carried and Loquito responded that they would have 9mm handguns, or "li'l baby thumpers," as he called them. "Just handguns?" Alvarez responded. He and the Corsons weren't worried: "we got somethin' way bigger'n that."

All three repeatedly reconfirmed their commitment to the robbery. Marcus: "you got your squad." Aaron: "I'm ready, man." Loquito said he needed a "professional crew." They reiterated that they were experienced and that they would be the "final crew." Alvarez: "I assured you it straight, so it straight." Aaron: "I'm ready, man"; "Just you do your part. We're gonna do ours, bro." Marcus: "[Y]ou got your squad"; "Man, it's on, dog." Then, one more time, Loquito confirmed the participation of all three:

| | |
|---|---|
| AARON: | Who the fuck, who the fuck ain't gonna move on some'in' for 15, 20 keys (U/I) |
| MARCUS: | Ya' know? I'm sayin', bro. |
| AARON: | (U/I) Tell you some'in', don't go lookin' nowhere else man. Signed, sealed, done deal, man. |
| UCO [LOQUITO]: | A'right, man. It's a deal. |
| ALVAREZ: | For sho. |
| UCO [LOQUITO]: | It's a deal. |
| ALVAREZ: | (U/I) |
| UCO [LOQUITO]: | Demon [Alvarez], I already talked to you about this, |
| ALVAREZ: | Yeah, (U/I) |
| UCO [LOQUITO]: | bro. |
| ALVAREZ: | (U/I) I'm sayin' it's all good. |

They finished the conversation discussing how they would split the proceeds or the "chops," as they called it. After some back-and-forth, mostly between Marcus and Alvarez, they settled on an equal share for all five involved. They left with the expectation that Loquito would call when he heard the deal was about to go down. And Loquito could get ahold of them easily, because "we're all a team." As Aaron put it, "You got the president hotline right now, man. That call comes in, everything stops, bro."

On November 27, the CI called Marcus to tell him the robbery might be the next day. On November 28, the CI called Marcus after Marcus got off work and told him that Loquito wanted to talk to them again about the robbery. Marcus responded, "I don't want to see dude again," referring to Loquito. The CI called back a few minutes later and asked whether he was "in or not." Marcus said, "I'm straight." After a few more calls, Marcus agreed to meet up.

Alvarez and the Corsons drove to a shopping mall parking lot to meet the CI and Loquito, who were already there. The CI (wearing the body wire) went over and got in Marcus's car. Marcus expressed some frustration about Loquito. Alvarez asked if Loquito was "just waitin' on the call and shit," and the CI responded affirmatively. Then Marcus complained that the CI and Loquito had parked their car in a way that might stick out to law enforcement. So Marcus started driving around the mall parking lot. (An ATF agent opined at trial that such a tactic is known as a "heat run," where

a suspect drives around to see if he's being followed.) Aaron asked whether the Mexican cartel had people following them; the CI said he didn't know. Aaron then asked the CI, "Are you strapped, too, right now or what?" referring to whether the CI was armed. The CI said he had a gun in Loquito's car. Marcus chimed in, "So, it's basically a waiting game, right?" The CI responded, "Yep, Waitin' on that call."

While they waited, they discussed some more of the mechanics of the robbery. Marcus said he didn't want Loquito to see his "get-away" car: "We don't even need to go in dude's car, man. That's the only thing. I just don't want dude to see this car, man, 'cause this our get-away ride right here." Marcus and Aaron offered to have the CI ride with them and let Loquito ride alone. But the CI declined, saying that Loquito would get suspicious. Marcus agreed and they continued to discuss how they wanted to execute the robbery. Marcus suggested that the CI and Loquito lead the way, with the three of them following behind. When the CI and Loquito got to the stash house, Marcus would pull up after the CI and Loquito started walking up to the house. After that, Aaron suggested they "bum rush."

After the CI took a call from Loquito, the CI started to get out and head back to Loquito's car to check on things. The CI asked the defendants whether he should call them when Loquito got the location on the stash house. Marcus said, "We just gonna go relocate in another spot . . . . as soon as you get the call, just call us, and then we're just gonna be waitin'." The defendants drove away

and never came back. Loquito called them several times to try to salvage the sting but to no avail. He asked them to reconfirm their commitment to the robbery but they refused. The sting was over.

The defendants weren't arrested that day, but about two weeks later. A search of defendants' residences revealed little evidence, only a baggie of bullets at Alvarez's apartment. The defendants were indicted on two conspiracy counts: (1) conspiracy to possess with intent to distribute five or more kilograms of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846; and (2) conspiracy to obstruct, delay or affect commerce, and the movement of a commodity in commerce, by means of robbery, in violation of 18 U.S.C. § 1951. After hearing from ATF agents, including "Loquito," as well as hearing the recordings of the conversations picked up over the body wire, the jury convicted the defendants of both counts.

At sentencing, Marcus requested a sentence below the mandatory minimum sentence of 10 years based on the "safety valve" provision under 18 U.S.C. § 3553(f) and U.S.S.G. § 5C1.2. In support, Marcus's counsel proffered a letter to the government outlining his version of the events. That letter was submitted to the court. But ultimately, the court denied the safety valve without much discussion. In the end, Marcus received 135 months of imprisonment, Alvarez received 165, and Aaron received 192.

Only Marcus and Alvarez appeal. They both appeal their convictions, arguing insufficient evidence. And Marcus

appeals his sentence on the basis that the court should have applied the safety valve.

## II.  Sufficiency of the Evidence (Both Marcus and Alvarez)

Marcus and Alvarez face a "nearly insurmountable hurdle" in this challenge to the sufficiency of the evidence to sustain their convictions. *United States v. Moore*, 572 F.3d 334, 337 (7th Cir. 2009) (quotation omitted). To reverse, we must be convinced that even "after viewing the evidence in the light most favorable to the prosecution, no rational trier of fact could have found him guilty beyond a reasonable doubt." *Id.* We will not "weigh the evidence or second-guess the jury's credibility determinations." *United States v. Stevens*, 453 F.3d 963, 965 (7th Cir. 2006) (quotation omitted). Nor will we "overturn a conviction because we would have voted to acquit." *Id.* Rather, "we will overturn a conviction based on insufficient evidence only if the record is devoid of evidence from which a reasonable jury could find guilt beyond a reasonable doubt." *United States v. Farris*, 532 F.3d 615, 618 (7th Cir.) (citation omitted), *cert. denied*, 129 S. Ct. 967 (2008).

The jury convicted Marcus and Alvarez of conspiring to rob a drug stash house and sell their loot. "Conspiracy is agreement to violate some other law." *United States v. Bartlett*, 567 F.3d 901, 905 (7th Cir. 2009); *see also United States v. Lechuga*, 994 F.2d 346, 349 (7th Cir. 1993) (en banc). Though it might seem odd, the fact that the stash house, the drugs—indeed the whole plot—was fake

is irrelevant. That the crime agreed upon was in fact impossible to commit is no defense to the crime of conspiracy. *United States v. Shively*, 715 F.2d 260, 266 (7th Cir. 1983). The crime of conspiracy is the agreement itself.[†] *See United States v. Shabani*, 513 U.S. 10, 11 (1994).

---

[†] Proof of an overt act is not required for drug conspiracies under 18 U.S.C. § 846. *See United States v. Shabani*, 513 U.S. 10, 11 (1994).

As for Hobbs Act conspiracies, 18 U.S.C. § 1951, we note that some of our decisions list an overt act as an element, without discussion of the issue. *See, e.g.*, *United States v. Stodola*, 953 F.2d 266, 272 (7th Cir. 1992) ("To prove conspiracy to commit extortion, the government was only required to prove that 'there was an agreement between two or more persons to commit an unlawful act, that the defendant was a party to the agreement, *and that an overt act was committed in furtherance of the agreement by one of the coconspirators*.'" (emphasis added) (quoting *United States v. Tuchow*, 768 F.2d 855, 869 (7th Cir. 1985))). A number of other circuits, however, have expressly held that a Hobbs Act conspiracy does not require proof of an overt act. *See, e.g.*, *United States v. Palmer*, 203 F.3d 55, 63 (1st Cir. 2000); *United States v. Pistone*, 177 F.3d 957, 959-60 (11th Cir. 1999); *United States v. Clemente*, 22 F.3d 477, 480 (2d Cir. 1994). In this case, the jury instructions did not include an overt act requirement for the Hobbs Act conspiracy count. The defendants do not appeal on those grounds, though. And indeed, at oral argument, appellants' counsel conceded that, in her view, there is no difference between the proof required for drug conspiracy and that required for a Hobbs Act conspiracy. Therefore, we will not consider whether proof of an overt act was required in this case.

The law has long punished the agreement to commit a crime as its own offense. *See id.* at 16 (citing *Regina v. Bass*, (1705) 88 Eng. Rep. 881, 882 (K.B.)); *Callanan v. United States*, 364 U.S. 587, 593 (1961). This is so because such agreements are dangerous in and of themselves. A collective criminal agreement "increases the likelihood that the criminal object will be successfully attained," "decreases the probability that the individuals involved will depart from their path of criminality," and "makes possible the attainment of ends more complex than those which one criminal could accomplish." *Callanan*, 364 U.S. at 593. Moreover, conspiracies often breed other crimes to further the ultimate criminal objective, like acquiring firearms or stealing getaway cars, and can even spawn "the commission of crimes unrelated to the original purpose for which the group was formed," *id.* at 594.

So in this case, the government must prove just that Marcus and Alvarez agreed to rob the stash house and sell the drugs, and that they "knowingly and intentionally join[ed] the agreement." *United States v. Rollins*, 544 F.3d 820, 835 (7th Cir. 2008). Alone, idle chitchat or mere boasting about one's criminal past is insufficient to establish a conspiracy. Specifically, proof of a drug conspiracy under 18 U.S.C. § 846 requires "substantial evidence that the defendant knew of the illegal objective of the conspiracy and agreed to participate." *United States v. Longstreet*, 567 F.3d 911, 918-19 (7th Cir. 2009) (quotation omitted). Yet, "[t]he agreement need not be formal, and the government may establish that agreement, as it may other elements of the charge, through circumstantial

evidence." *United States v. Gilmer*, 534 F.3d 696, 701 (7th Cir. 2008) (quotation omitted); *see also United States v. Turner*, 93 F.3d 276, 282 (7th Cir. 1996). For instance, "[a] conspiracy may be shown by evidence which shows that the co-conspirators embraced the criminal objective of the conspiracy, that the conspiracy continued towards its common goal, and that there were co-operative relationships." *Gilmer*, 534 F.3d at 703.

Moreover, an agreement must exist among *coconspirators*, that is, those who actually intend to carry out the agreed-upon criminal plan. *United States v. Mahkimetas*, 991 F.2d 379, 383 (7th Cir. 1993). A defendant is not liable for conspiring solely with an undercover government agent or a government informant. *Id.*

Marcus and Alvarez challenge their conspiracy convictions in two ways. First, they contend that they never agreed to violate the law. Instead, they merely boasted and "talked tough," but, they submit, that talk never crystallized to form an agreement to do something illegal. (They assert no claim of entrapment.) Second, they contend that they never agreed with one another. If they agreed with anyone, they argue, they each agreed with the CI or the undercover agent, which is not a conspiracy.

The record proves them wrong on both points. Marcus and Alvarez did much more than talk tough. There was ample evidence to support the jury's finding that the defendants agreed to rob the stash house and sell their loot (keep in mind that the government gets the benefit of all reasonable inferences that can be drawn from the

trial evidence, *United States v. Lee*, 558 F.3d 638, 641 (7th Cir. 2009)): (1) the defendants met with the CI multiple times to discuss the robbery; (2) during each meeting the defendants sought details about the plan, such as whether the stash house guards were armed, how much coke would be there, and when the robbery would take place; (3) the defendants said they were willing to kill if necessary and indicated they had strong firepower to counter that of the guards; (4) they repeatedly discussed how they would execute the robbery—who would ride with whom, how the defendants would drive to the stash house, how many lookouts to have, and whether to go in quietly or "bum rush" like a "police raid"; (5) they acknowledged the quantity of drugs they expected ("15, 20 keys") and discussed the "chops," or how they would divide up their loot; (6) they repeatedly expressed concern that the coke had to be there; if it wasn't, the defendants made clear that there would be consequences for the CI and "Loquito"; (7) the defendants showed up at the staging location on the day the robbery was to take place; (8) Aaron asked the CI if he was "strapped, too," implying the defendants were armed as well; (9) Marcus said his car was the "getaway ride" and that he didn't want Loquito to see it; (10) Marcus did a "heat run" to avoid police detection and said he felt Loquito had parked too conspicuously; and (11) the defendants time and again reaffirmed their commitment to doing the robbery—"I'm in," "it's gravy," "I'm down," "done deal," "we got the crew," "it's on, dog," "we in it a hundred percent, bro."

All of this evidence showed an intent to carry out the stash house robbery. Moreover, it showed an agreement

among the defendants to do so. Accordingly we must conclude that a rational jury could find the defendants guilty of conspiracy beyond a reasonable doubt.

Marcus and Alvarez try to poke holes in this evidence, but to no avail. For instance, they argue that Aaron's "strapped, too" question did not imply that the defendants were armed. This squares with the district court's conclusion at sentencing that the defendants were not armed. This is because, according to the defendants, Aaron actually said "strapped-to," which simply meant "armed," rather than the government's translation "strapped, too," which meant "armed *as well*." (The government's transcription of the body-wire recording says "strapped, too." The defense did not offer an alternate transcription for the jury.) In support, the defendants point to another occasion when Marcus used the same phrase in asking whether the stash house guards were armed. In that situation, the defendants contend, Marcus couldn't have meant "armed as well" since he wouldn't have been referring to himself, and therefore "strapped, too" should have been understood as "strapped-to."

But the record does not require that conclusion. Even though the district court came to a different conclusion at sentencing, we must view the evidence in a different light. (Remember that on a sufficiency-of-the-evidence challenge, we draw all reasonable inferences in the government's favor. *Id.*) Why couldn't Marcus have been referring to himself as being armed as well? The defendants repeatedly talked about their own firearms and their willingness to kill when asking about the stash

house guards. Moreover, the jury heard the word "strapped" referring to "armed" two more times, without hearing the word "too" (or "-to") along with it. In one instance, Aaron asked if the guards would be "strapped-up." And then later, when discussing how they would enter the stash house, Marcus said, "We could come around the corner, Joe, *strapped*, and get in that door, Joe." (emphasis added). So the contention that the defendants always used the term "strapped-to" to mean "armed" is belied by these other statements. With that, we conclude that the inference that "strapped, too" meant "armed as well" was a reasonable one, and as such, must conclude that Aaron asked the CI whether he, like the defendants, was also carrying firearms.

Likewise, when Marcus told the CI, "I'm straight," on November 28, the day the robbery was to take place, the jury need not necessarily have concluded, as the defendants suggest, that Marcus meant that he didn't want any part of the robbery. Nothing in the record requires that conclusion. In fact, the record suggests the opposite. During the November 20 meeting, Alvarez reconfirmed to Loquito his commitment to the robbery plan by saying, "I assured you it straight, so it straight."

Essentially, the defendants ask us to reweigh the evidence. They argue that the defendants never contacted the CI on their own, the CI always called first; that they met infrequently; that the defendants exhibited an uneasiness about the undercover officer (e.g., "I don't want to see dude again"); that Marcus worked on the day of the robbery, contrary to prior plans; and that

despite boasting about being experienced thieves, neither the CI nor the agents saw or found any cash, guns, or anything else typically associated with that activity (indeed, there was some evidence that Alvarez lived on the floor of his mother's apartment—though this might have been construed as an incentive for Alvarez to participate in a lucrative robbery). But these are arguments more appropriate for a jury than for an appellate court—in fact, these *were* the defendants' arguments to the jury in this case. (Trial Tr. vol. 4, 664-70, 678-79, 682, 687, August 22, 2007.) We will not reweigh the evidence on appeal. *United States v. Squibb*, 534 F.3d 668, 672 (7th Cir. 2008).

The fact that the defendants drove away before actually going to the "stash house" falls in this category as well. The agreement—and thus the crime of conspiracy—was already complete. Even if their disappearance from the staging area is viewed as withdrawal, it would not absolve them of all liability. *See United States v. Read*, 658 F.2d 1225, 1232 (7th Cir. 1981). The defendants argue that this is evidence that a conspiracy never existed in the first place. But the jury rejected that interpretation in finding the defendants guilty. We cannot conclude that was an erroneous decision. The evidence was sufficient to establish that the defendants agreed to rob the fictitious stash house.

So was the evidence establishing that the defendants agreed with one another, and not just with the CI or the undercover agent. The defendants bantered back and forth between each other about the plan of attack. They

discussed among themselves how they would divide the loot, or the "chop," as they called it. They talked about their prior experience doing robberies together. They showed up to the mall parking lot on the day of the robbery riding in the same car together. And, of course, they each reiterated their willingness to participate, while in each other's company and referring to themselves as a group. They were a "team," a "squad," the "final crew." We conclude that this was sufficient evidence for a rational jury to conclude that the defendants agreed, amongst themselves, to the robbery plan. Accordingly, we affirm the defendants' convictions.

### III.  Safety Valve (Marcus Only)

Marcus also challenges his sentence. The "safety valve" gives first-time offenders a lower sentencing guidelines range, U.S.S.G. § 5C1.2(a), and is one of only two ways the court can impose a sentence below a mandatory minimum, 18 U.S.C. § 3553(f); *see also id.* § 3553(e). Though Marcus contends that the district court erred by denying him the benefits of the safety valve, Marcus's point is really a procedural one. Marcus makes barely any argument on appeal that he actually deserved the safety valve. Instead, he focuses on the district court's explanation, or lack thereof, for denying the safety valve. We review a district court's denial of a safety valve departure for clear error, *United States v. Olivas-Ramirez*, 487 F.3d 512, 516 (7th Cir. 2007), but we review its sentencing procedures de novo, *United States v. Castaldi*, 547 F.3d 699, 706 (7th Cir. 2008).

Marcus points out that the district court must give a sufficient explanation for its sentence. Though "[t]hat explanation need not be exhaustive[,] . . . it must be adequate to allow for meaningful appellate review and to promote the perception of fair sentencing." *United States v. Scott*, 555 F.3d 605, 608 (7th Cir. 2009) (quotation omitted). Here, the court's discussion of the safety valve was not elaborate. The court did acknowledge Marcus's request for the safety valve and described what the guidelines range would be if the safety valve applied, which was 121 to 151 months, as opposed to 151 to 188 months without it. And the court ultimately imposed a sentence of 135 months, within the reduced range. Still, the court indicated it was not applying the safety valve. The court said it was "not inclined to go below the mandatory minimum sentence . . . because I do think that the offense conduct was very serious and frightening." And when specifically asked about the safety valve, the court stated, "I am denying the safety valve and imposing a sentence under 3553." This final statement does not provide much in the way of an explanation for denying the safety valve.

But whether a sentencing court must specifically outline its reasons for denying a safety valve request, or whether the court's discussion in this case was insufficient, are issues we need not reach. For even if Marcus is correct that the district court's explanation was faulty, any error was harmless. Marcus did not meet the requirements for the safety valve.

To qualify for the safety valve, a defendant must meet five criteria. 18 U.S.C. § 3553(f); s*ee also United States v.*

*Ponce*, 358 F.3d 466, 468 (7th Cir. 2004) (defendant bears burden of proving eligibility for safety valve). The only one at issue here is the fifth, which requires that "not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan." 18 U.S.C. § 3553(f)(5). That information need not necessarily be useful to the government, as long as a defendant made a good faith effort to cooperate fully. *United States v. Thompson*, 106 F.3d 794, 800-01 (7th Cir. 1997).

Marcus attempted to meet this fifth requirement with a letter from his attorney sent to the government and ultimately submitted to the court. In the letter, Marcus essentially denied the existence of a conspiracy. The letter proffered that Marcus, Aaron, and Alvarez were very suspicious of the stash house plot from the get-go: they thought that the CI was a snitch and that Loquito's plan sounded implausible. The letter also asserts that they never initiated contact with the CI or the undercover agent, noting that they were concerned about turning down the plot because the CI had a position of authority in their gang (the Latin Kings) and could severely punish them if they disobeyed. In the end, the letter states that Marcus, Aaron, and Alvarez "confirmed that they did not intend to take part in the robbery," and that when they showed up to the parking lot on the day of, they each "expressly told [the CI] that he was not interested in the robbery."

But a letter merely reiterating one's innocence, which is belied by the evidence in the case as shown to the jury, does not satisfy the fifth criterion for the safety valve. "Continu[ing] to cling to a false version of events and dispute [one's] culpability . . . is a sufficient basis for refusing to invoke the safety valve provision." *Id.* at 801. The letter from Marcus's counsel essentially rehashes a jury argument—that he never intended to rob the stash house—and throws in what his attorney asserts were purportedly some of Marcus's and his co-conspirators' personal thoughts and discussions. The jury rejected that version of the events, and as we discussed above, was rational in doing so. Consequently, Marcus's proffer failed to meet Congress's purpose for enacting the safety valve statute, "to allow lenience toward low-level defendants who did their best to cooperate." *United States v. Marin*, 144 F.3d 1085, 1095 (7th Cir. 1998) (quotation omitted). So we affirm the denial of the safety valve.

## IV. Conclusion

We AFFIRM Corson's and Alvarez's convictions. We also AFFIRM Corson's sentence.

8-27-09