In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-1384

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MIGUEL NUNEZ,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 09-CR-128—**Rudolph T. Randa**, *Judge.*

ARGUED SEPTEMBER 14, 2010—DECIDED NOVEMBER 30, 2010

Before BAUER, FLAUM, and HAMILTON, *Circuit Judges*.

FLAUM, *Circuit Judge*. Miguel Nunez pled guilty to knowingly and intentionally possessing over 500 grams of cocaine with intent to distribute. The district court sentenced Nunez to sixty months imprisonment, the mandatory minimum sentence, after determining that Nunez was not eligible for a "safety valve" adjustment to his sentence, which would have permitted the court to set a sentence below the mandatory minimum. Nunez argues

that the district court violated his due process right to be sentenced on the basis of reliable information when it considered hearsay information from two confidential informants at sentencing. We affirm.

## I. Background

An informant working under the direction and control of law enforcement made four controlled purchases of cocaine from Miguel Nunez between January 20, 2009, and April 30, 2009. Three of the purchases took place either inside or in the alley behind Nunez's "stash house" in Milwaukee, Wisconsin; the fourth occurred at the Omega Restaurant in Milwaukee.

During the second purchase, which took place at Nunez's stash house, the informant observed Angie Schram, Nunez's girlfriend, inside the residence. Nunez told the informant that he was living with Schram in a trailer home. During the third purchase, Nunez told the informant that he was still living with Schram in her trailer home. After the transaction, government agents observed Nunez leave his stash house and briefly meet with Jose Garza, one of Nunez's co-defendants in this case, in Nunez's vehicle.

Nunez and the informant scheduled the fourth purchase during a recorded telephone call on April 30, 2009. The informant planned to purchase .5 kilograms of cocaine from Nunez at the Omega Restaurant in Milwaukee, Wisconsin. Agents surveilled Nunez before the meeting and observed the following events: Nunez arrived at his

trailer home in Oak Creek, Wisconsin, with Garza follow-ing in his own vehicle; both men then entered Nunez's residence, where they remained for approximately eight minutes before leaving and driving towards the Omega Restaurant in separate cars; upon arriving at the restaurant, Nunez parked in the parking lot and Garza parked across the street, where he had a direct view of Nunez and the informant. The informant then met with Nunez in Nunez's car.

Government agents arrested Nunez and Garza at the scene of the fourth purchase. The agents recovered .5 kilograms of cocaine from Nunez's vehicle. Agents searched Garza and his vehicle, discovering 1.5 grams of cocaine, a small amount of marijuana, and $1,200 in cash. Agents also conducted a consent search of Garza's resi-dence, finding two firearms and a digital scale. Finally, agents searched Nunez's and Schram's trailer residence pursuant to a search warrant, recovering three ounces of powder cocaine, packaging materials, and two digital scales. Agents also observed drugs and drug paraphernalia scattered around their residence.

Nunez, Garza, and Schram were indicted on May 12, 2009. Nunez was indicted on five counts of drug-related offenses. Count Five, the only Count relevant to this appeal, was issued against Nunez and Garza for possessing 500 grams or more of cocaine with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B), and 18 U.S.C. § 2.

Nunez debriefed with government agents on June 25, 2009. During the debriefing, Nunez provided background

information about his involvement in the drug trade, including, for example, when he first became involved in selling drugs. He also discussed the names of individuals from whom he obtained drugs, the prices he paid for drugs, the amounts he dealt, and the locations at which he stored drugs, among other information. But Nunez refused to provide any information regarding his customers, and he also failed to mention Garza's and Schram's knowledge of and involvement in the above-mentioned controlled purchases, other than to state that he had given Garza some cocaine. Instead, when asked about Garza's presence near the scene of Nunez's arrest, Nunez stated that Garza was there because Nunez planned to purchase lawn furniture from a store near the Omega Restaurant, and Garza was going to help Nunez transport the furniture back to Nunez's house. Nunez stated that Garza had nothing to do with the drug transaction for which Nunez was arrested.

The government scheduled a second debriefing to learn more about the charged offense. But Nunez indicated that he was unwilling to discuss his customers and co-defendants, and that he was only willing to discuss particular suppliers. The government ended the debriefing because it was not interested in Nunez's proposed limits.

On August 5, 2009, government agents interviewed a confidential informant ("CI-1") who was housed at Waukesha County Jail with Nunez. During his interview, CI-1 stated that he knew Nunez and Garza through affiliations with gangs, and that he had purchased marijuana from Garza on various occasions. CI-1 stated that

Nunez told him details about his arrest, including that it occurred at the Omega Restaurant. CI-1 also indicated that Nunez told him that Garza was aware of the drug transaction for which Nunez was arrested, and that Garza was across the street from the site of the transaction to serve as a lookout. CI-1 provided government agents with various other details that Nunez told him about the case, including that Garza had roughly one gram of cocaine on him when he was arrested; that the police seized two firearms while searching Garza's residence; that the police searched Nunez's residence and recovered three ounces of cocaine; that Nunez had a trailer home that was different from his stash house; that Nunez spoke to a police officer on one occasion, but the officer to whom he spoke was not the officer who arrested him; and that Schram knew that Nunez was selling cocaine and that he kept cocaine at their residence. CI-1 stated that Nunez told him that Nunez and Garza were optimistic that they would receive the money from the fourth controlled purchase and that they used the same cocaine source. CI-1 also stated that Nunez told him that Nunez lied about Garza's involvement in the offenses at issue to government agents during his debriefing because "there was no need for both of them to go to jail," and that he was not going to tell the police about his drug source because he was going to need the source again when he got out of jail. CI-1 also explained that Nunez admitted to him that he intended to lie to government agents about Garza's and Schram's participation in the cocaine transactions to make it seem like they were not involved.

On October 27, 2009, government agents interviewed a second confidential informant ("CI-2"). Although CI-2 did not know Nunez or Garza, he identified Nunez from a photograph as an individual with whom he had recently been housed at Waukesha County Jail. CI-2 stated that he saw a person who was also housed in jail with him conversing with Nunez while in jail. It is unclear whether CI-2 stated that the person he observed talking to Nunez was CI-1; the notes documenting the government's interview with CI-2 redact both informants' names. CI-2 stated that he did not hear most of the conversation between the person and Nunez, but that he knew that Nunez discussed his arrest related to a federal cocaine case.

Nunez pled guilty to Count Five in October 2009. Prior to sentencing, the United States Probation Office ("USPO") interviewed Nunez for a Presentence Investigation Report ("PSR"). The PSR found that Nunez was eligible for a safety valve adjustment pursuant to 18 U.S.C. § 3553(f), which permits the district court to impose a sentence below the mandatory minimum.

The government filed a written objection with the USPO via email on January 17, 2010, asserting that Nunez did not satisfy the fifth requirement of safety valve eligibility, which requires that defendants "truthfully provide[ ] to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan." 18 U.S.C. § 3553(f)(5). The government argued that Nunez was not eligible for a safety valve designation

because he limited the scope of his debriefing, and thus failed to provide full and complete information about his and his co-defendants' relevant conduct. In particular, the government asserted that Nunez attempted to falsely exculpate Garza, and that he failed to discuss Schram's involvement in the offense. To support its objection, the government attached to its email notes from Nunez's first debriefing, and from its interviews with CI-1 and CI-2. The government did not call CI-1 to testify at Nunez's sentencing because CI-1 received death threats from members of Nunez's gang.

Nunez filed a response to the government's objection, arguing that hearsay evidence may be considered at sentencing only if it is reliable. Nunez argued that statements made by an unidentified confidential informant cannot be deemed reliable or accurate unless the government could show good cause for not disclosing CI-1's identity, and that CI-1's statement was sufficiently corroborated. Nunez asserted that the government failed to adequately demonstrate good cause or sufficient corroboration. Accordingly, he argued that he should remain eligible for the safety valve designation since the government's objection rested upon unreliable and unverifiable information obtained from a confidential informant.

The district court held a sentencing hearing on February 5, 2010, at which both Nunez and the government presented oral arguments. The district court concluded that Nunez was not eligible for a safety valve adjustment. It sentenced Nunez to sixty months imprisonment on Count Five, the mandatory minimum. The court also sentenced

Nunez to four years of supervised release, and ordered him to pay $4,500 in restitution for the buy money expended in the case and a $100 special assessment.

Nunez timely appeals. He also moves to strike portions of the government's opposition brief that reference facts that he alleges are not part of the record on appeal.

## II. Analysis

### A. The Record On Appeal

Nunez moves to strike three portions of the government's opposition brief, arguing that the government violated Federal Rule of Appellate Procedure 10(a) by referencing facts that are not a part of the record on appeal. First, Nunez argues that particular facts the government references in the first two sentences of the second full paragraph on page six, and in the third sentence of the second full paragraph on page eighteen do not appear in the sources to which the government cites as support. Second, Nunez argues that the government's reference to its proffer at sentencing regarding Nunez's second debriefing with law enforcement in the first full paragraph of page ten is improper. Nunez concedes that the proffer itself is in the sentencing transcript. But he argues that the government never provided him with notes from the second debriefing, and that the content of the second debriefing was never presented to the district court in any form other than the government's proffer at the sentencing hearing.

Rule 10(a) provides that "[t]he following items constitute the record on appeal: (1) the original papers and exhibits

filed in the district court; (2) the transcript of proceedings, if any; and (3) a certified copy of the docket entries prepared by the district clerk." FED. R. APP. P. 10(a); *see also* 7th Cir. R. 10; *Henn v. Nat'l Geographic Soc'y*, 819 F.2d 824, 831 (7th Cir. 1987). The government concedes that it cited to the wrong source on pages six and eighteen of its opposition brief; it erroneously cited to the plea agreement, while the challenged assertions on pages six and eighteen of its brief appear in an affidavit attached to the criminal complaint. In addition, the government correctly points out that each of the challenged assertions on page ten of its opposition brief regarding Nunez's second debriefing was presented to the district court at the sentencing hearing, and thus they appear on the transcript from that hearing. Accordingly, we deny Nunez's motion to strike; the portions of the government's brief that Nunez seeks to strike are all included in the record on appeal pursuant to Federal Rule of Appellate Procedure 10(a).

### B.  Safety Valve Eligibility

Nunez argues that the district court violated his due process right by basing its sentencing decision on unreliable information. He argues that the district court improperly relied upon CI-1's out-of-court statement when it found Nunez ineligible for a safety valve adjustment.

This case implicates three standards of review. First, we review for clear error a district court's denial of a safety valve departure. *United States v. Corson*, 579 F.3d 804, 813 (7th Cir. 2009). "[A] sentencing court clearly errs by considering hearsay evidence only if the evidence

was devoid of any indicia of reliability." *United States v. Sanchez*, 507 F.3d 532, 538 (7th Cir. 2007); *see also United States v. Hollins*, 498 F.3d 622, 629 (7th Cir. 2007) ("Clear error will be found when, on review of the entire evidence, we are left with the definite and firm conviction that a mistake has been made."). Second, we review for abuse of discretion a district court's determination that a confidential informant's hearsay statement is sufficiently reliable. *United States v. Mays*, 593 F.3d 603, 608 (7th Cir. 2010). Finally, we review de novo a district court's sentencing procedures. *Corson*, 579 F.3d at 813.

Title 18, Section 3553(f) permits courts to impose a sentence below the mandatory minimum to defendants who meet five requirements. The fifth requirement provides that defendants must "truthfully provide[ ] to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan." 18 U.S.C. § 3553(f)(5). "This plainly broad language suggests that any and all information that the defendant possesses concerning the offense must be provided to the Government." *United States v. Montes*, 381 F.3d 631, 636 (7th Cir. 2004) (internal quotation marks and citation omitted); *see also United States v. Ponce*, 358 F.3d 466, 468 (7th Cir. 2004) ("[The fifth criterion of § 3553(f)] requires a defendant to make a good-faith attempt to cooperate with the authorities and volunteer all the relevant information he has concerning his offense." (citations omitted)); *United States v. Arrington*, 73 F.3d 144, 149 (7th Cir. 1996) ("[Section] 3553(f) states that a defendant must disclose 'all information' concerning the course

of conduct-not simply the facts that form the basis for the criminal charge"). Even if the government did not specifically ask a defendant to provide particular information, it is the defendant's duty to satisfy the requirements in § 3553(f), and the defendant must at least offer the information he has. *See Arrington*, 73 F.3d at 148; *see also Ponce*, 358 F.3d at 468; *United States v. Ramirez*, 94 F.3d 1095, 1101 (7th Cir. 1996). The sentencing guidelines explain that "offense or offenses that were part of the same course of conduct or of a common scheme or plan" includes "the offense of conviction and all relevant conduct." U.S.S.G. § 5C1.2, cmt. n.3. In order to qualify for the safety valve adjustment, the defendant bears the burden of proving each of the five requirements by a preponderance of evidence. *Montes*, 381 F.3d at 634. A defendant "cannot meet this burden if the government challenged the truthfulness, accuracy, or completeness of his statements and he produced nothing to persuade the district court that his disclosures were truthful and complete." *United States v. Martinez*, 301 F.3d 860, 866 (7th Cir. 2002). The district court concluded that Nunez did not satisfy the fifth requirement for safety valve eligibility. Nunez argues that the district court based its conclusion on unreliable information.

Defendants have a due process right to be sentenced on the basis of reliable information. *United States v. Lanterman*, 76 F.3d 158, 160-61 (7th Cir. 1996). Defendants who challenge their sentence on the ground that the sentencing court considered unreliable information must demonstrate both that unreliable information was before the sentencing

court, and that the sentencing court relied on that informa-
tion in reaching its sentencing decision. *See Lechner v.
Frank*, 341 F.3d 635, 639 (7th Cir. 2003) (citing *United States
v. Tucker*, 404 U.S. 443 (1972)); *see also United States
v. Hankton*, 432 F.3d 779, 790 (7th Cir. 2005). But
the evidentiary standards are relaxed at sentencing; judges
can consider a largely unlimited scope of evidence,
"as long as [the evidence] has 'sufficient indicia of reliabil-
ity to support its probable accuracy.'" *United States
v. Maiden*, 606 F.3d 337, 339 (7th Cir. 2010) (quoting
*Hankton*, 432 F.3d at 790); *see also Mays*, 593 F.3d at 608;
*United States v. Johnson*, 489 F.3d 794, 796-97 (7th Cir. 2007).
Accordingly, we routinely hold that "hearsay is permit-
ted at sentencing if it is reliable[, and that] reliability may
be established by corroborating evidence." *United States
v. Martinez*, 289 F.3d 1023, 1029 (7th Cir. 2002).

We have held that "[a] sentencing court demonstrates
actual reliance on misinformation when the court gives
'explicit attention' to it, 'found[s]' its sentence 'at least in
part' on it, or gives 'specific consideration' to the informa-
tion before imposing sentence." *Lechner*, 341 F.3d at
639 (quoting *United States v. Tucker*, 404 U.S. 443 (1972));
*see also United States v. Salinas*, 365 F.3d 582, 586-87 (7th
Cir. 2004). The district court explained its decision that
Nunez was ineligible for a safety valve adjustment in three
forms. First, during the sentencing hearing on February
5, 2010, the district court stated:

> Well, the Court has heard the arguments now and
> the Court has read the submissions. The Court has
> reviewed the authority that is relied upon by the

> defense in the Cammisano case[, 917 F.2d 1057 (8th Cir. 1990)]. It is an Eighth Circuit case. The Court is not bound by that precedent. But having read all of this -- and the Court will make these as part of the Court's reasoning in the record, obviously -- the Court doesn't think and feel that the Defendant has been fully cooperative, truthful. And, in fact, the sense of the Court is that it is just the opposite in some of these encounters. And that is all supported by the fact that . . . there was [sic] limitations set upon this discussion of relevant conduct here. So the Court is . . . going to find that the Defendant is not eligible for the safety valve.

Second, in its Statement of Reasons, the district court explained that Nunez was ineligible for a safety valve adjustment because he did not meet the fifth requirement in § 3553(f) of providing truthful information. Third, the minutes from the sentencing hearing state: "Court does not think the defendant has been fully cooperative or truthful. In fact, it's just the opposite. Court finds the defendant is not eligible for the safety valve."

The government urged the district court to conclude that Nunez failed to satisfy the fifth requirement for safety valve eligibility based on two sources of evidence. First, the government argued that Nunez placed limits on the scope of his second debriefing, indicating that he failed to provide the government with all of the information he had concerning the charged offense. Second, the government argued that CI-1's statement demonstrated both that Nunez lied, and that he failed to provide the govern-

ment with enough information during his first debriefing to satisfy the fifth safety valve requirement. Based on the government's arguments and the district court's three explanations above, the district court arguably relied on both pieces of evidence. Accordingly, we discuss each in turn. We conclude by addressing Nunez's remaining arguments on appeal.

### 1. The Second Debriefing

The government informed the district court that Nunez placed limits on the topics he was willing to discuss during his second debriefing: Nunez was unwilling to discuss his customers and his co-defendants, and he was only willing to discuss particular suppliers.

Nunez does not challenge the reliability of the government's proffer at the sentencing hearing concerning the limits he placed on his second debriefing. Instead, he argues that the district court must have relied solely on CI-1's statements when it concluded that Nunez was untruthful and unwilling to provide the government with all information he had concerning the charged offense. At the sentencing hearing, the district court expressly indicated that it considered the limits Nunez placed on his second debriefing. It, thus, clearly relied, at least in part, on the limits Nunez placed on his second debriefing in reaching its sentencing decision. *See Lechner*, 341 F.3d at 639.

The limits Nunez placed on his second debriefing suffice to affirm the district court's decision that Nunez was

ineligible for a safety valve adjustment: They demonstrate that Nunez failed to provide the government with "all information and evidence" he had "concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan." 18 U.S.C. § 3553(f)(5); *see Montes*, 381 F.3d at 634-37; *Ponce*, 358 F.3d at 468-69; *United States v. Alvarado*, 326 F.3d 857, 860-62 (7th Cir. 2003); *Arrington*, 73 F.3d at 148-49; *Ramirez*, 94 F.3d at 1101. The district court did not clearly err when it concluded that Nunez was ineligible for a safety valve adjustment based, at least in part, on the limits he placed on his second debriefing. In fact, we would affirm the district court if it relied solely on the limits Nunez placed on his second debriefing.

### 2. CI-1's Statement

Nunez argues that the district court erred primarily in three ways when it considered CI-1's statements at sentencing. First, he argues that CI-1's statements were unreliable, and thus that the district court abused its discretion when it held otherwise. Next, Nunez argues that the district court failed to undertake a sufficiently searching inquiry to ensure that CI-1's statement was reliable. Finally, he argues that the district court abused its discretion in concluding that CI-1's statement was reliable because it failed to meaningfully exercise its discretion. We disagree.

Nunez argues that CI-1's statements were unreliable. He posits that reliability can be established by disclosing CI-1's identity, corroborating CI-1's statements with other

evidence, allowing the cross-examination of CI-1, or evaluating whether CI-1's statements are consistent with other statements or evidence in the case. Nunez argues that the government failed to establish CI-1's reliability in any of these four ways.

Contrary to Nunez's argument, however, evidence on the record corroborates significant portions of CI-1's statement. For example, the plea agreement corroborates the exact weight of cocaine that CI-1 stated was found at Nunez's residence, the location at which Nunez was arrested, and that Garza was parked across the street from the Omega Restaurant during the fourth controlled purchase. The affidavit submitted in support of the criminal complaint corroborates CI-1's statement regarding the approximate weight of cocaine found on Garza's person at the time of his arrest. Portions of CI-1's statement regarding Schram's awareness that Nunez was selling cocaine, which Nunez neglected to mention during his debriefings, and Garza's awareness of and involvement in the charged offense, which Nunez allegedly lied about during his debriefings, are also corroborated by evidence on the record. For example, CI-1's statement that Schram knew that Nunez was selling cocaine is corroborated by evidence indicating that Schram was present at one of the controlled purchases, that Nunez lived with Schram, and that agents found cocaine, packaging materials, and two digital scales at the residence Schram and Nunez shared, and drug paraphernalia scattered inside. Also, CI-1's statement that Garza was acting as a lookout during the drug purchase at the Omega Restaurant, which indicates that Nunez lied to the government when he stated

that Garza was at the scene solely to help transport lawn furniture, is corroborated by the fact that Garza parked his car across the street from the parking lot in which Nunez met with the government informant to transfer the drugs, in a place where he had a direct view of Nunez. At least the portions of CI-1's statement that were corroborated had "sufficient indicia of reliability to support its probable accuracy." *Hankton*, 432 F.3d at 790; *see also Mays*, 593 F.3d at 608-09; *United States v. Are*, 590 F.3d 499, 521-23 (7th Cir. 2009); *Martinez*, 289 F.3d at 1029; *United States v. Morrison*, 207 F.3d 962, 967-69 (7th Cir. 2000). Arguably, then, the district court did not err by relying on CI-1's statement.

But even if the district court erred, the error was harmless. *See Are*, 590 F.3d at 523. The limitations Nunez placed on his second debriefing suffice to affirm the district court's conclusion that Nunez was not eligible for a safety valve adjustment. *See, e.g.*, 18 U.S.C. § 3553(f)(5); *Montes*, 381 F.3d 631, 634-37. Further, relying on CI-1's statement could not have affected any aspect of Nunez's sentence other than his safety valve eligibility: He received the mandatory minimum, and he would not have received a different sentence if the district court had not considered CI-1's statement. Thus, any error in relying on CI-1's statements was harmless. *See Are*, 590 F.3d at 523.

Nunez's argument that the district court failed to undertake a sufficiently searching inquiry into the accuracy of CI-1's statements is similarly unavailing. Nunez notes that we have reversed and remanded for a more searching inquiry when a sentencing court relied on a particular

piece of evidence without providing an explanation for why it credited that piece of evidence over another, inconsistent piece of evidence. But the line of cases to which Nunez cites primarily involves contradictory statements by one witness regarding drug quantities, offered to assist in a relevant conduct calculation at sentencing. *See United States v. Galbraith*, 200 F.3d 1006, 1012-13 (7th Cir. 2000); *United States v. McEntire*, 153 F.3d 424, 435-37 (7th Cir. 1998); *United States v. Beler*, 20 F.3d 1428, 1433-35 (7th Cir. 1994). *But see United States v. Zehm*, 217 F.3d 506, 514-15 (7th Cir. 2000) (comparing a witness's statement to statements from other witnesses and the defendant's version of the events). This case is distinct. Also, Nunez does not argue that CI-1's statements are internally inconsistent; he argues merely that CI-1's statements contradict Nunez's. We frequently affirm district courts' decisions to credit hearsay evidence at sentencing when the hearsay is corroborated by evidence on the record. *See, e.g.*, *Hankton*, 432 F.3d at 791-93; *Morrison*, 207 F.3d at 968-69; *United States v. Corbin*, 998 F.2d 1377, 1386-87 (7th Cir. 1993). The district court did not err in relying on CI-1's statement, even if it credited CI-1's statement over Nunez's assertions in doing so. Again, though, even if this was error, the error was harmless. *See Are*, 590 F.3d at 523.

Nunez's next argument, that the district court abused its discretion because it did not consider and weigh the factors relevant to evaluating the reliability of CI-1's reliability, is also unpersuasive. We have explained that "[a]n exercise of discretion, in sentencing as in other

settings, cannot be affirmed when the judge fails to consider and weigh the factors that bear on its exercise." *United States v. Roberson*, 474 F.3d 432, 436 (7th Cir. 2007). But we must merely "satisfy ourselves, before we can conclude that the judge did not abuse his discretion, that he exercised his discretion, that is, that he considered the factors relevant to that exercise." *Id.* (quoting *United States v. Cunningham*, 429 F.3d 673, 679 (7th Cir. 2005)). Although the district court did not provide a detailed analysis of precisely why it decided to rely on CI-1's statement, it explained that it considered all of the parties' arguments on the issue, which included arguments about the reliability of CI-1's statement. Understandably, a party may desire a more thorough explanation, but the district court judge appears to have exercised his discretion. *See Roberson*, 474 F.3d at 436; *Cunningham*, 429 F.3d at 679. As explained above, however, even if the district court judge abused his discretion, the error was harmless. *See Are*, 590 F.3d at 523.

Finally, Nunez argues that CI-1 was unreliable because he had a motive to lie. But this assertion is wholly speculative and contrary to case law. *See Galbraith*, 200 F.3d at 1012 (writing that "the testimony of just one witness, even a potentially biased witness, is sufficient to support a finding of fact" at sentencing, and that "the trial court is entitled to credit testimony that is totally uncorroborated and comes from an admitted liar, convicted felon, large scale drug-dealing, paid government informant" (internal quotation marks and citations omitted)).

**3. Nunez's Remaining Arguments on Appeal**

Nunez asserts two other arguments on appeal. First, he argues that the information he provided to the government during his first debriefing satisfied the fifth requirement in § 3553(f). Nunez provided detailed information related to the charged offense. But the limits he placed on his second debriefing, without more, warranted concluding that Nunez was ineligible for a safety valve adjustment. *See* 18 U.S.C. § 3553(f)(5); *Montes*, 381 F.3d at 634-37.

Second, Nunez argues that the fact that the USPO originally found Nunez eligible for a safety valve adjustment when drafting the PSR facially indicates that he met his burden of showing eligibility for the safety valve adjustment. Nunez argues that since he met his burden, the government should have faced a burden of production when calling the information in the PSR into question, and that the burden should have shifted back to the defendant to convince the court that the facts presented were actually true only if the government met its burden of production. Nunez correctly acknowledges that Seventh Circuit case law provides for burden-shifting when a *defendant* challenges information in a PSR during sentencing. *See, e.g.*, *United States v. Moreno-Padilla*, 602 F.3d 802, 808-09 (7th Cir. 2010). He argues that fundamental fairness supports applying this doctrine when the *government* challenges information in a PSR. While a government's challenge to a PSR that fails to reference any evidence on the record and is based on pure speculation may not require a defendant to produce more evidence to support the PSR's finding, we have not expressly

adopted Nunez's proposed burden-shifting framework. Instead, we maintain that the defendant bears the burden of proving entitlement to a safety valve adjustment, *Montes*, 381 F.3d at 634, and that a defendant cannot meet his burden "if the government challenged the truthfulness, accuracy, or completeness of his statements and he produced nothing to persuade the district court that his disclosures were truthful and complete." *Martinez*, 301 F.3d at 866. Even if we required the government to produce evidence that Nunez failed to meet the fifth requirement in § 3553(f), it effectively did so when it discussed Nunez's second debriefing at the sentencing hearing, and when it presented CI-1's statement to the district court. The district court correctly concluded that Nunez failed to meet the fifth requirement in § 3553(f).

### III. Conclusion

We AFFIRM Nunez's sentence.